VOTE CHOICE, INC., et al.,
Plaintiffs, Appellees,

v.

Joseph DiSTEFANO, etc., et al.,
Defendants, Appellees,

Elizabeth Leonard, Plaintiff, Appellant.

VOTE CHOICE, INC., et al.,
Plaintiffs, Appellees,

v.

Joseph DiSTEFANO, etc., et al.,
Defendants, Appellants.

Nos. 93–1171, 93–1236.

United States Court of Appeals,
First Circuit.

Heard June 10, 1993.

Decided Aug. 31, 1993.

28

Neal J. McNamara, with whom Matthew F. Medeiros, Providence, RI, was on brief, for plaintiff Elizabeth Leonard (No. 93–1171) and for plaintiffs-appellees (No. 93–1236).

Donald J. Simon, with whom Sonosky, Chambers, Sachse & Endreson, Washington, DC, was on brief for Common Cause and Common Cause of R.I., amici curiae (No. 93–1171).

Anthony J. Bucci, Jr., with whom Licht & Semonoff, Providence, RI, was on brief, for defendants Joseph DiStefano, et al.

Donald J. Simon, with whom Sonosky, Chambers, Sachse & Endreson, Roger M. Witten, Carol F. Lee, W. Hardy Callcott, Eric J. Mogilnicki, and Wilmer, Cutler & Pickering, Washington, DC, were on brief, for Common Cause and Common Cause of R.I., amici curiae (No. 93–1236).

Before SELYA, CYR and BOUDIN, Circuit Judges.

SELYA, Circuit Judge.

These consolidated appeals, which implicate various aspects of Rhode Island's campaign finance law, necessitate the exploration of largely uncharted constitutional terrain. One appeal, prosecuted on behalf of the state, seeks to reinstate a statute requiring certain political action committees (PACs)[1] to disclose information about all their contributors. The other appeal, prosecuted by an unsuccessful gubernatorial candidate, Elizabeth Leonard, inveighs against state statutes that bestow special advantages on candidates who comply with eligibility requirements for public campaign financing. At the end of our journey across *terra incognita*, we conclude that the district court acted appropriately both in striking down the first dollar disclosure requirement and in upholding the incentive provisions. Therefore, we affirm.

## I. BACKGROUND

Before addressing the merits, we offer an overview of Rhode Island's campaign finance law and a brief synopsis of the proceedings below. In so doing, we strive to place each challenged provision in its overall statutory context and to describe the nature of the disagreement surrounding it.

### A. *Statutory Framework: The State's Appeal.*

Rhode Island has a set of laws regulating the financing of state and local election campaigns. *See* R.I.Gen.Laws §§ 17–25–1 to 17–25–30.1 (1988 & Supp.1992). The entity charged with primary responsibility for implementing these laws is the Rhode Island Board of Elections. *See id.* at § 17–25–5.

Rhode Island law directs all PACs and candidates to file reports with the Board of Elections at regular intervals. *See id.* at § 17–25–11. The Board then "prepare[s] and make[s] available for public inspection ... summaries of all reports." *Id.* at § 17–25–5(a)(4). The reports are to include the name, address, and place of employment of every person or entity contributing more than $100 to the reporting PAC or candidate. *See id.* at § 17–25–7.

In 1992, the Rhode Island General Assembly, desirous of ensuring that the voting public possesses accurate information about organizations whose contributions and expenditures may influence elections, devised extra reporting obligations for PACs. Every PAC now must file a notice listing its goals and purposes, the positions it plans to advocate on ballot questions, the names of any candidates it intends to support, and the names and addresses of its officers. *See id.* at § 17–25–15(a). Moreover, every PAC must report the name and address of all persons to whom it makes expenditures, indicating the amount and purpose of each such payment. *See id.* at § 17–25–15(c)(2). The Board of Elections is empowered to halt PACs from using names which are misleading or which do not accurately identify a committee's membership and contributor base. *See id.* at § 17–25–15(d).

Under the neoteric amendments, PACs must also "include in each report required to be filed ... [t]he source and amount of all funds received." *Id.* at § 17–25–15(c)(1). This added requirement of "first dollar disclosure"—the duty to disclose the identity of, and the amount given by, every contributor, no matter how modest the contribution— applies to most PACs, but does not apply in the same way to PACs sponsored by labor unions or those which are funded through payroll checkoff plans. *See id.* The requirement does not apply to candidates at all.

### B. *Statutory Framework: Leonard's Appeal.*

In addition to regulating campaign contributions, Rhode Island also affords public funding to gubernatorial candidates.[2] *See id.*

---

1. Rhode Island law defines a PAC as

 any group of two (2) or more persons which accepts any contributions to be used for advocating the election or defeat of any candidate or candidates or to be used for advocating the approval or rejection of any question or questions submitted to the voters.

 R.I.Gen.Laws § 17–25–3(j) (Supp.1992).

2. From and after January 1, 1993, candidates for certain other statewide offices are also eligible to receive public funding. *See* R.I.Gen.Laws § 17–25–20. Withal, because Leonard's appeal arises

at § 17–25–18. Candidates may elect whether or not to accept such funds. *See, e.g., id.* at § 17–25–19. If a candidate elects to participate, and meets the law's eligibility requirements,[3] the state will match money raised from private sources up to a maximum of $750,000. *See id.* In return, the state requires participants to observe certain restrictions on campaign spending and related activities.

A candidate must signify a desire to use public funds for campaign purposes upon formally declaring his or her candidacy for office.[4] *See id.* A candidate choosing this option must sign a sworn statement pledging to comply with the various terms and conditions of the grant. *See id.* at § 17–25–20(1). Once made or omitted, the election and pledge are irrevocable. *See id.* at §§ 17–25–19, 17–25–20(1). Thereafter, a participating candidate must meet the law's threshold requirements, limit the use of public funds received to certain enumerated purposes, *compare* R.I.Gen.Laws § 17–25–20(7) & (8) (listing permissible uses) *with id.* at § 17–25–7.2 (describing permissible uses of privately raised funds), abide by overall expenditure ceilings and fundraising caps,[5] *see, e.g., id.* at § 17–25–20(2), and return a percentage of any unexpended funds. *See id.* at § 17–25–25.

To make the offer of public financing more attractive and thereby increase participation, the 1992 amendments included a contribution

cap gap. A candidate can ordinarily receive up to $1,000 from any given person or PAC in a single calendar year. *See id.* at § 17–25–10.1. The amendment doubled this limit for publicly funded candidates, *see id.* at § 17–25–30(3), and, in the bargain, created a cap gap between privately and publicly funded candidates. At the same time, the legislature ordained that candidates who comply with the eligibility criteria for public financing would be

> [e]ntitled to an additional benefit of free time on community antenna television to be allocat[ed] pursuant to rules determined by the administrator for the division of public utilities.

*Id.; see also id.* at § 17–25–30.1 (obligating state public utilities administrator to formulate relevant rules). Such candidates are also entitled to "free time on any public broadcasting station operating under the jurisdiction of the Rhode Island public telecommunications authority." *Id.* at § 17–25–30(2).

## C. *Proceedings Below.*

Two PACs (Vote Choice and Gun Owners PAC), certain individuals who wish to contribute anonymously to each, and the Rhode Island affiliate of the American Civil Liberties Union brought suit in the district court seeking to enjoin the Board of Elections from enforcing R.I.Gen.Laws § 17–25–15(c)(1). They posited that the provision self-destructed on three separate bases, *viz.*, (1) the first

---

in the context of the 1992 elections, we limit our discussion to gubernatorial candidates.

3. The eligibility criteria are set forth in R.I.Gen. Laws § 17–25–20. We attach a statutory appendix that includes key provisions of Rhode Island's campaign finance law as they stood in the time frame of the 1992 elections.

4. Under Rhode Island law, persons seeking state elective office must file formal declarations of candidacy in June of the year in which the election is to be held. *See* R.I.Gen.Laws § 17–14–1. For purposes of the campaign finance act, however, a person may be considered a candidate at an earlier time:

> The term "candidate" means any individual who undertakes any action, whether preliminary or final, which is necessary under the law to qualify for nomination for election, or election to public office, and/or any individual who

receives a contribution or makes an expenditure or gives his or her consent for any other person to receive a contribution or make an expenditure with a view to bringing about his or her nomination or election to any public office, whether or not the specific public office for which he or she will seek nomination or election is known at the time the contribution is received or the expenditure is made and whether or not he or she has announced his or her candidacy or filed a declaration of candidacy at that time.

R.I.Gen.Laws § 17–25–3(a).

5. A publicly financed candidate may exceed these limits if a privately funded opponent exceeds them. *See* R.I.Gen.Laws § 17–25–24. Nevertheless, the publicly financed candidate confronts a temporal impediment; he or she may raise additional money only in proportion to the amount *already expended* by a privately funded opponent. *See id.*

amendment bars any attempt to mandate first dollar disclosure of political contributors' identities; (2) Rhode Island's first dollar disclosure law, when placed in its statutory context, places an impermissible burden on associational rights; and (3) the proviso denies the plaintiffs equal protection. The Board and two amici, Common Cause and Common Cause of Rhode Island, eventually took up the cudgels in defense.

In the same complaint, Leonard sought to enjoin the Board of Elections, the Rhode Island Division of Public Utilities, and the Rhode Island Public Telecommunications Authority from implementing the contribution cap gap and the free-television-time incentive provisions.[6] She argued that these enactments violate the first amendment in a variety of ways, and, moreover, that federal law, specifically 47 U.S.C. § 315 (1988), preempts the statutory grant of free television time. The state resisted these exhortations on the merits and also contended that Leonard lacked standing because she did not face a publicly funded opponent in the general election.[7] The amici supported the state's position.

The district court merged the hearing on preliminary injunction with trial on the merits. See Fed.R.Civ.P. 65(a)(2). After taking testimony, the court held first dollar disclosure, in and of itself, to be unconstitutional and invalidated R.I.Gen.Laws § 17–25–15(c)(1) on that basis. See Vote Choice v. DiStefano, 814 F.Supp. 195, 199–202 (D.R.I. 1993). The court also ruled that, although Leonard had standing to mount a constitutional challenge, id. at 204, her contentions were impuissant. See id. at 207. The Board appeals from the district court's nullification of the first dollar disclosure rule and Leonard appeals from the court's refusal to outlaw the contribution cap gap and the free-television-time incentives.

## II. THE STATE'S APPEAL

The first amendment is incorporated into the fourteenth amendment and, in that way, constrains state action. See New York Times Co. v. Sullivan, 376 U.S. 254, 276–77, 84 S.Ct. 710, 723–24, 11 L.Ed.2d 686 (1964) (ruling that the free speech clause applies to the states through the fourteenth amendment; collecting cases). Accordingly, our consideration of R.I.Gen.Laws § 17–25–15(c)(1) starts with a discussion of whether first dollar disclosure provisions are always repugnant to the first amendment. Concluding (contrary to the court below) that they are not, we then examine whether the particular first dollar disclosure provision here at issue passes the test of constitutionality.

### A. *The Per Se Challenge.*

The district court struck down R.I.Gen.Laws § 17–25–15(c)(1) as *per se* violative of the first amendment, concluding that a state legislature "must establish at least some [non-zero] minimum threshold for public disclosure of contributions to PACs." *Vote Choice,* 814 F.Supp. at 202. Because this holding deals with a matter of law rather than fact—it rests squarely on the district court's sculpting of the first amendment's contours—our review is plenary. See *LeBlanc v. B.G.T. Corp.,* 992 F.2d 394, 396 (1st Cir.1993).

It is old hat that compelled disclosure of information about a person's political contributions "can seriously infringe on [the] privacy of association and belief guaranteed by the First Amendment." *Buckley v. Valeo,* 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976) (per curiam) (collecting cases). Thus, courts routinely subject statutes mandating revelation of contributors' identities in the arena of political speech to exacting scrutiny. See, e.g., *Gibson v. Florida Legislative Investigation Comm.,* 372 U.S. 539, 546, 83 S.Ct. 889, 893, 9 L.Ed.2d 929 (1963). A disclosure statute may survive such scrutiny

---

**6.** The chief executive officer of each entity, sued in his official capacity, is a named defendant. Clearly, however, the state is the real party in interest. We treat the appeals accordingly.

**7.** Leonard sought the Republican nomination for governor without party endorsement. She pre-vailed in the primary election and carried the party's standard in the general election. She did not opt for public funding. Her opponent in the general election, Governor Sundlun, likewise eschewed public funding.

only if it satisfies a two-part test: (1) the statute as a whole must serve a compelling governmental interest, and (2) a substantial nexus must exist between the served interest and the information to be revealed. *See Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 91–92, 103 S.Ct. 416, 419–20, 74 L.Ed.2d 250 (1982); *Buckley*, 424 U.S. at 64, 96 S.Ct. at 656.

With respect to the test's first prong, no fewer than three governmental interests have proven sufficient, in varying circumstances, to justify obligatory disclosure of contribution-related information. Thus, forced disclosure may be warranted when the spotlighted information enhances voters' knowledge about a candidate's possible allegiances and interests, inhibits actual and apparent corruption by exposing large contributions to public view, or aids state officials in enforcing contribution limits. *See Brown*, 459 U.S. at 92, 103 S.Ct. at 420; *Buckley*, 424 U.S. at 66–68, 96 S.Ct. at 657–58. Because R.I.Gen.Laws § 17–25–15(c)(1), read as part of an integrated whole, plainly satisfies this prong of the test—indeed, the Rhode Island statute appears to advance the three interests we have mentioned in much the same fashion as did the statute before the *Buckley* Court—we proceed directly to the difficult question of whether a substantial relationship exists between the precise modicum of information required to be disclosed and some compelling state interest.

We agree with the plaintiffs that, in certain respects, the fit required to meet the test's second prong is lacking. As the disclosure threshold drops toward zero, the bond between the information revealed and the governmental interests involved becomes weaker and, therefore, more tenuous. *See, e.g., Buckley*, 424 U.S. at 83–84, 96 S.Ct. at 665. Common sense suggests that information about the source of a $1 contribution does not advance the state's interest in deterring actual or apparent corruption because such a

donation has a limited (perhaps nonexistent) potential to exact an illegal or unethical *quid pro quo*. Similarly, such information bears little discernible relation to the state's interest in enforcing contribution limits that dip no lower than $1,000: few persons will donate $1 to a PAC on more than 1,000 separate occasions—and those that try will likely grow arm-weary in the process.

But, viewed from another, equally proper, angle, the fit is quite comfortable: signals are transmitted about a candidate's positions and concerns not only by a contribution's size but also by the contributor's identity. *See Goland v. United States*, 903 F.2d 1247, 1261 (9th Cir.1990); *FEC v. Furgatch*, 807 F.2d 857, 862 (9th Cir.), *cert. denied*, 484 U.S. 850, 108 S.Ct. 151, 98 L.Ed.2d 106 (1987); *see also First Nat'l Bank v. Bellotti*, 435 U.S. 765, 791–92 & n. 32, 98 S.Ct. 1407, 1423–24 & n. 32, 55 L.Ed.2d 707 (1978) (discussing required disclosure of corporate advertisers' names). Since the identity of a contributor is itself informative, quite apart from the amount of the contribution, a candidate's ideological interests may often be discerned as clearly from a $1 contribution as from a $100 contribution. Hence, we conclude that there is a substantial link between data revealed by first dollar disclosure' and the state's compelling interest in keeping the electorate informed about which constituencies may command a candidate's loyalties.[8]

*Buckley* buttresses this conclusion. There, in evaluating whether a $10 recordkeeping threshold and a $100 disclosure threshold passed constitutional review, the Court admonished that decisions about "the appropriate level at which to require recording and disclosure" are "necessarily . . . judgmental" and, therefore, best left to legislative discretion. *Buckley*, 424 U.S. at 83, 96 S.Ct. at 665. Consequently, so long as legislatively imposed limitations are not "wholly without rationality," courts must defer to the legislative will. *Id.* We think that this approach is

---

8. In this respect, the goal of enhancing voter awareness about the interests to which a candidate may be responsive is separate and distinct from the goal of thwarting corruption. The former is best served by compulsory disclosure of data about all the various sorts of philosophical and ideological interests to which a candidate

may be sensitive while the latter is equally well served by targeting a particular form of *quid pro quo* "responsiveness." *See generally Buckley*, 424 U.S. at 66–68, 96 S.Ct. at 657–58. While first dollar disclosure furthers the former goal, it does not meaningfully advance the latter goal.

fully transferable to the instant case. Because the notion of first dollar disclosure is not entirely bereft of rationality—as we have already indicated, such a requirement relates to at least one sufficiently cogent informational goal—any general embargo against first dollar disclosure statutes would be inconsistent with the *Buckley* Court's insistence upon judicial deference to plausible legislative judgments.

Nor does *Buckley* stand alone in support of the conclusion that the Constitution does not prohibit *all* first dollar disclosure statutes. Other trail markers, like spoor for the cognoscenti, lead in the same direction. *See, e.g., Brown*, 459 U.S. at 89 & n. 2, 103 S.Ct. at 418 & n. 2 (specifically noting that a statute mandated first dollar disclosure, yet failing to identify any potential constitutional infirmity); *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 300, 102 S.Ct. 434, 439, 70 L.Ed.2d 492 (1981) (stating that "if it is thought wise, legislation can outlaw anonymous contributions") (dictum); *cf. California Bankers Ass'n v. Schultz*, 416 U.S. 21, 55–56, 94 S.Ct. 1494, 1514, 39 L.Ed.2d 812 (1974) (holding that the first amendment does not create a *per se* rule forbidding disclosure of contributor names in all situations); *Oregon Socialist Workers 1974 Campaign Comm. v. Paulus*, 432 F.Supp. 1255, 1260 (D.Or.1977) (three-judge court) (upholding first dollar recordkeeping and partial public disclosure threshold).

█ We hold that first dollar disclosure is not, in all cases, constitutionally proscribed. Because the court below struck down R.I.Gen.Laws § 17–25–15(c)(1) on this very ground—it said, in essence, that first dollar disclosure necessarily leaves insufficient breathing room for first amendment freedoms, *see Vote Choice*, 814 F.Supp. at 202—our consideration of the statute's constitutionality must probe the plaintiffs' other rationales. After all, a judgment, although arrived at by faulty reasoning, still can be sustained on some other ground made manifest by the record. *See, e.g., Martel v. Stafford*, 992 F.2d 1244, 1245 (1st Cir.1993); *Chongris v. Board of Appeals*, 811 F.2d 36, 37 n. 1 (1st Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987). We

turn, then, to the plaintiffs' next theory—a theory that shifts from an exclusive focus on whether first dollar disclosure provisions are ever permissible to a more holistic focus on whether Rhode Island's disclosure requirement, considered in light of the state's overall campaign finance law, withstands constitutional scrutiny.

### B. *The Contextual Challenge.*

█ It is apodictic that courts, when passing upon the constitutionality of a statutory provision, must view it in the context of the whole statutory scheme. *See Storer v. Brown*, 415 U.S. 724, 737, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974); *Williams v. Rhodes*, 393 U.S. 23, 34, 89 S.Ct. 5, 12, 21 L.Ed.2d 24 (1968). Here, plaintiffs' contextual challenge centers on the disparity between the first dollar disclosure threshold applicable to those who choose to pool money by making contributions to PACs and the $100 disclosure threshold applicable to those who choose to act alone by making direct contributions and expenditures. *Compare* R.I.Gen.Laws § 17–25–15(c)(1) *with id.* at § 17–25–7. Plaintiffs say that this disparity not only burdens PAC contributors' first amendment rights of association but also undermines Rhode Island's boast that first dollar disclosure of PAC contributions represents a rationally selected device geared toward achieving a compelling state interest. We find plaintiffs' analysis to be convincing.

█ The first amendment frowns upon laws which burden associational rights, particularly in the sphere of political speech. The more lopsided the burdens, the more probable it is that a constitutional infirmity looms. Thus, in *Berkeley*, the Supreme Court struck down a limitation on contributions to PACs, resting its holding not on the impermissibility of the limits *per se*, but, rather, on the disparity between those limits and the limits applicable to persons who, for one reason or another, preferred not to pool their resources:

> To place a Spartan limit—or indeed any limit—on individuals wishing to band together to advance their views on a ballot measure, while placing none on individuals acting alone, is clearly a restraint on the

right of association. [Laws which] do[ ] not seek to mute the voice of one individual ... cannot be allowed to hobble the collective expressions of a group.

*Berkeley,* 454 U.S. at 296, 102 S.Ct. at 437.

■■■ We believe that this passage enunciates three fundamental precepts. First, any law that burdens the rights of individuals to come together for political purposes is suspect and must be viewed warily. Second, burdens which fall exclusively on those who choose to exercise their right to band together, leaving individual speakers unbowed, merit heightened scrutiny. Third, measures which hinder group efforts to make independent expenditures in support of candidates or ballot initiatives are particularly vulnerable to constitutional attack. The first two precepts derive in part from the importance of group expression as a method of amplifying the voices of those with meager means. *See FEC v. National Conservative Political Action Comm.,* 470 U.S. 480, 493–94, 105 S.Ct. 1459, 1466–67, 84 L.Ed.2d 455 (1985) (collecting cases); *Buckley,* 424 U.S. at 65–66, 96 S.Ct. at 656–57. The last precept derives in part from the fact that independent expenditures, because they have a more attenuated connection with a particular candidate, are a less likely source for *quid pro quo* corruption and a questionable indicator of candidate loyalties. *See Buckley,* 424 U.S. at 39, 96 S.Ct. at 644 (noting that independent expenditures are "at the core of our electoral process and of the First Amendment freedoms") (citation and internal quotation marks omitted).

In *Berkeley,* these three precepts coalesced to scuttle a contribution cap. *See* 454 U.S. at 296, 102 S.Ct. at 437. The case at bar is a fair congener. Here, as in *Berkeley,* the challenged enactment hobbles collective expression by mandating that groups disclose contributors' identities and the extent of their monetary support, no matter how tiny. This, in itself, is a red flag. *See Buckley,* 424 U.S. at 64, 96 S.Ct. at 656 (observing that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief"); *id.* at 83, 96 S.Ct. at 665 (observing

that "[c]ontributors of relatively small amounts are likely to be especially sensitive to recording or disclosure of their political preferences"). Here, as in *Berkeley,* the statute has a much less stringent rule for those who prefer individual expression to collective expression. Here, as in *Berkeley,* the statute imposes its one-sided burden regardless of whether a group's members have banded together to contribute directly to a candidate or to make independent expenditures concerning a candidate or referendum.[9] We think that these three points of comparison accurately foretell that here, as in *Berkeley,* the statute cannot stand.

The state strives valiantly to avoid the force of this comparison. It says that, even if section 17–25–15(c)(1) burdens associational rights to some moderate extent, the law nevertheless merits enforcement under the rubric of legislative prerogative. We disagree.. While legislative judgments must be given a wide berth, judicial deference should never be confused with outright capitulation. Federal courts would abdicate their constitutional responsibility if they were to rubberstamp whatever constructs a state legislative body might propose. And, in any event, judicial deference to legislative line-drawing diminishes when the lines are disconnected, crooked, or uneven. So it is here: the Rhode Island General Assembly has made a series of conflicting judgments about appropriate disclosure thresholds without offering any legally satisfactory explanation for its pererrations.

This zigging and zagging is of especial concern because, when citizens engage in first amendment activity affecting elections, the state's interest in disclosure is generally a constant, that is, the state's interest "is the same whether or not [the individual actors] are members of an association." *Minnesota State Ethical Practices Bd. v. National Rifle Ass'n,* 761 F.2d 509, 513 (8th Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 853, 88 L.Ed.2d 893 (1986); *see also New Jersey Citizens Action v. Edison Township,* 797 F.2d 1250, 1265 (3d Cir.1986) (requiring that

---

**9.** Under Rhode Island law, PACs may form for the exclusive purpose of promoting or opposing ballot questions. *See* R.I.Gen.Laws § 17–25–

15(f). A PAC formed for such a purpose is subject to the first dollar disclosure requirement.

government demonstrate a special risk stemming from a particular form of first amendment activity in order to justify disclosure requirements for that form of activity), *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 186 (1987). Rhode Island, in one fell swoop, not only departed from the usual rule of constancy but also imported a particularly virulent strain of unevenness into its statutory scheme: most PACs must disclose the identity of every contributor, regardless of amount, while individual candidates need disclose the identities only of contributors who donate upwards of $100.

This imbalance does not cater to any cognizable government interest. It does not serve the state's interest in combatting corruption because corruption can as easily spring from direct contributions to candidates as from contributions that flow through PACs. And, if the danger that tiny contributions will foment corruption is not great enough to justify significant inroads on first amendment rights, *see supra* Part II(A), it is certainly not great enough to justify disparate treatment of PACs. Similarly, the unevenness does not serve the state's interest in enforcing its contribution limits; after all, the district court found no evidence that PAC contributors might try to subvert the $1,000 cap by an endless stream of $1 donations. *See Vote Choice,* 814 F.Supp. at 202.

Finally, the interest in an informed citizenry cannot justify the disparity at issue here. To be sure, when contributors' identities are made public, the name of a PAC, standing alone, could in some states have little meaning to a large segment of the electorate. *See California Medical Ass'n v. FEC,* 453 U.S. 182, 201, 101 S.Ct. 2712, 2724, 69 L.Ed.2d 567 (1981) (observing that "entities hav[ing] differing structures and purposes ... may require different forms of regulation in order to protect the integrity of the electoral process"); *see also Austin v. Michigan St. Chamber of Commerce,* 494 U.S. 652, 668, 110 S.Ct. 1391, 1402, 108 L.Ed.2d 652 (1990); *FEC v. National Right to Work Comm.,* 459 U.S. 197, 210, 103 S.Ct. 552, 561, 74 L.Ed.2d 364 (1982). But, Rhode Island has guarded

against this contingency by requiring that PACs reveal a wide array of information about their goals and purposes. *See* R.I.Gen. Laws § 17–25–15(a); *see also supra* p. 29. The obvious result of Rhode Island's legislative mosaic is that when a candidate discloses that a particular PAC has given to his or her cause, state law ensures that this fact will signify more about the candidate's loyalties than the disclosed identity of an individual contributor will ordinarily convey. We think this circumstance is properly considered, *see Storer,* 415 U.S. at 743, 94 S.Ct. at 1285 (explaining that other state requirements may be considered in evaluating whether a disclosure requirement is sufficiently essential to repel a constitutional challenge); *see also Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 637 & n. 11, 100 S.Ct. 826, 836 & n. 11, 63 L.Ed.2d 73 (1980); *Let's Help Fla. v. McCrary,* 621 F.2d 195, 200–01 (5th Cir.1980), *aff'd mem.,* 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284 (1982), and it weighs heavily in our conclusion that the claimed justification for the added (first dollar disclosure) burden that Rhode Island imposes on PACs and PAC contributors is more illusory than real.

In sum, R.I.Gen.Laws § 17–25–15(c)(1) has at least three grave weaknesses. First, by mandating public revelation of all PAC contributors, it burdens the rights of individuals to band together for the purpose of making either independent election expenditures or direct political contributions. Second, by imposing this burden on PACs and PAC contributors while regulating candidates and certain of their financial backers (*viz.,* individuals who contribute directly to candidates rather than to PACs) more loosely, the statute compounds the unfairness of the burden. Finally, the disparity between the two disclosure thresholds (one for PACs and the other for individuals), and, hence, the net burden imposed solely on associational rights, bears no substantial relation to the attainment of any important state interest. Their cumulative effect compels the conclusion that the statute abridges the first amendment.[10]

**10.** In light of this determination, we need not address a further statutory anomaly: that, while

most PACs are held to first dollar disclosure under Rhode Island law, a select group of PACs

We have one more stop to make before leaving this subject. The amici invite us to limit any determination of unconstitutionality to the two plaintiff PACs. However, the cases relied on by the amici, *see, e.g.,* *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986); *Brown,* 459 U.S. 87, 103 S.Ct. 416, involve explicit as-applied challenges to particular statutes. Here, in contrast, plaintiffs mounted a facial attack on R.I.Gen.Laws § 17–25–15(c)(1) and the case proceeded below on this theory. Moreover, the reason we invalidate the statute concerns the disparate treatment of PACs *qua* PACs, and, thus, obtains with equal vigor regardless of which particular PAC may be involved. This is a salient consideration in determining what remedy is appropriate, *see, e.g., Sec'y of State v. Joseph H. Munson Co.,* 467 U.S. 947, 967–68, 104 S.Ct. 2839, 2852–53, 81 L.Ed.2d 786 (1984); *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 799–800, 104 S.Ct. 2118, 2125–26, 80 L.Ed.2d 772 (1984), as is the fact that our reasoning does not derive its force from situation-specific features. *See, e.g., National Treas. Employees Union v. United States,* 990 F.2d 1271, 1277–78 (D.C.Cir.1993). Finally, only the amici have advocated the limitation-of-remedy position and "[w]e know of no authority which allows an amicus to interject into a case issues which the litigants, whatever their reasons might be, have chosen to ignore." *Lane v. First Nat'l Bank,* 871 F.2d 166, 175 (1st Cir.1989); *accord McCoy v. Massachusetts Inst. of Technology,* 950 F.2d 13, 23 n. 9 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992). For these reasons, we decline the amici's invitation.[11]

To recapitulate, then, we reject both Rhode Island's appeal and the amici's importuning that we apply a Band–Aid in lieu of surgically excising the malignancy. Consequently, we uphold the permanent injunction barring enforcement of R.I.Gen.Laws § 17–25–15(c)(1). In striking down the statute, however, we take a narrower path than did the court below. As legislatures must tread carefully in this complicated area, so, too, must courts. We decline to rule out categorically the legislative tool of first dollar disclosure; that tool may in certain contexts—although not here—serve sufficiently compelling government interests to be upheld.

## III. LEONARD'S APPEAL

We have arrived at Leonard's appeal. Before addressing the merits, we resolve the question of standing.

### A. *Standing.*

 Standing doctrine involves "a blend of constitutional requirements and prudential considerations." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). On the constitutional side, Article III limits federal court adjudication to matters which achieve the stature of justiciable cases or controversies. Ordinarily, this means that a party invoking the court's authority must show: (1) that he or she has suffered some actual or threatened injury as a result of the defendant's putatively illegal conduct, (2) that the injury may fairly be traced to the challenged action, and (3) that a favorable decision will likely redress the injury. *See Riverside v. McLaughlin,* —— U.S. ——, ——, 111 S.Ct. 1661, 1667, 114 L.Ed.2d 49 (1991); *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758. We have cautioned that "[t]he ingredients of standing are imprecise and not easily susceptible to concrete definitions or mechanical application." *United States v. AVX Corp.,* 962 F.2d 108, 113 (1st Cir.1992).

 When declaring her candidacy, Leonard had to make an irrevocable commitment either to shun or to embrace public

enjoys preferential treatment. *See* R.I.Gen.Laws § 17–25–15(c)(1) (exempting PACs sponsored by labor unions and those which are funded through payroll checkoff plans from first dollar disclosure requirements). Similarly, because we decide that Rhode Island's first dollar disclosure provision impermissibly burdens the right to as-

sociation, we need not determine whether it also violates the equal protection clause.

**11.** For many of the same reasons, we cannot employ the statute's severability provision, R.I.Gen.Laws § 17–25–17, to rescue any portion of the first dollar disclosure.

financing. Leonard's testimony suggests that, having decided to forgo the embrace, she had to structure her campaign to account for her adversaries' potential receipt of television time, fundraising advantages, and the like. Her opponent in the Republican primary, Mayor Levesque, opted for public financing. Leonard testified that Levesque accepted contributions over $1,000 while she had to turn away similar contributions. What is more, because one of the two major candidates in the Democratic gubernatorial primary also opted for public funding, Leonard had to plan for the possibility that a publicly financed candidate would oppose her in the general election.

Based on this and other evidence, the district court's finding that the coerced choice between public and private financing "colored [Leonard's] campaign strategy from the outset," *Vote Choice*, 814 F.Supp. at 204, seems unimpugnable. In our view, such an impact on the strategy and conduct of an office-seeker's political campaign constitutes an injury of a kind sufficient to confer standing. *See Buckley*, 424 U.S. at 12 & n. 10, 96 S.Ct. at 631 & n. 10 (determining that standing existed in a case where certain candidates challenged disparate rules and contribution caps); *Storer*, 415 U.S. at 738 n. 9, 94 S.Ct. at 1283 n. 9 (noting that simply being subjected to election law requirements, even indirectly, may constitute cognizable injury); *see also AVX Corp.*, 962 F.2d at 113–14 (defining "injury"). Therefore, Leonard satisfies the first furculum of the test.

Leonard also possesses the remaining attributes of constitutional standing. The injury she suffered can be traced directly to the state's actions: the statutory provisions, and the Board's implementation of them, caused the harm of which Leonard complains. As to redressability, Leonard seeks a permanent injunction against continued enforcement of the very statutes which caused her injury. This produces the necessary causal connection between the injury alleged and the relief requested.[12] *See, e.g., Allen v. Wright*, 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984).

Over and above its constitutional requisites, "the doctrine of standing also embodies prudential concerns regarding the proper exercise of federal jurisdiction." *AVX Corp.*, 962 F.2d at 114. Leonard's case qualifies on this score as well. In the interest of expedition, we refer the reader who hungers for detail to the district court's erudite discussion of this point. *See Vote Choice*, 814 F.Supp. at 204. We add only that Leonard is asserting her own rights and interests (not someone else's); that her grievances are particularized and concrete; and that her claim falls well within the zone of interests protected by the first amendment. No more is exigible. *See, e.g., Allen*, 468 U.S. at 751, 104 S.Ct. at 3324; *Warth v. Seldin*, 422 U.S. 490, 499–500, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975); *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). Thus, Leonard has standing to pursue her quest.

## B. *The Contribution Cap Gap.*

Leonard has questioned several different provisions of the statute. We turn initially to her claim that the contribution cap gap is inimical to the first amendment.[13] In reaching this issue, we stress that Leonard assails only the disparity between the two

---

12. The Board suggests that this causal link snapped once the general election concluded, thereby rendering the case moot. We disagree. There is a recognized exception to the mootness doctrine for matters capable of repetition yet evading review. This is such a case. The injury Leonard seeks to palliate was too fleeting to be litigated fully prior to the climax of the gubernatorial campaign and, since there is a reasonable expectation that Leonard will encounter the same barrier again—after all, she has not renounced possible future candidacies, and politicians, as a rule, are not easily discouraged in the pursuit of high elective office—the exception applies. *See Democratic Party of the U.S. v. Wiscon-*

sin, 450 U.S. 107, 115 n. 13, 101 S.Ct. 1010, 1015 n. 13, 67 L.Ed.2d 82 (1981); *Bellotti*, 435 U.S. at 774, 98 S.Ct. at 1414.

13. Under Rhode Island law, contributions to political campaigns are customarily capped at $1,000 per donor. *See* R.I.Gen.Laws § 17–25–10.1. However, a candidate who qualifies for public funds is entitled to receive contributions in amounts up to $2,000 per donor. *See id.* at § 17–25–30(3). This disparity constitutes the contribution cap gap of which Leonard complains.

caps; she voices no *in vacuo* challenge to the $1,000 cap applicable to candidates, such as herself, who eschew public funding.

Leonard's serenade has two themes. Her major theme is that regulatory disparities of this type are inherently impermissible. Her minor theme is that the cap gap burdens her first amendment rights without serving a corresponding governmental interest. We consider these asseverations sequentially, affording plenary review. *See LeBlanc*, 992 F.2d at 396.

**1. The Per Se Challenge.** Leonard's *per se* challenge to the contribution cap gap boils down to the assertion that, whenever government constructs incentives for candidates to accept fundraising limits, it departs from its required role as an umpire and becomes a player in the electoral process, much like, say, a referee who eases the rules for one team and not the other. The most immediate barrier to the success of this argument is that the Supreme Court has upheld a very direct and tangible incentive: the provision of public funds to candidates who agree to place decreased reliance on private campaign contributions. *See Buckley*, 424 U.S. at 85–109, 96 S.Ct. at 666–677; *see also Republican Nat'l Comm. v. FEC*, 487 F.Supp. 280, 283–86 (S.D.N.Y.) (three-judge court) (*RNC I*), *aff'd mem.*, 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980); *Republican Nat'l Comm. v. FEC*, 616 F.2d 1, 2 (2d Cir.) (*en banc*) (adopting reasoning of *RNC I* in parallel proceeding), *aff'd mem.*, 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980).

In a Briarean effort to scale this barrier, Leonard attempts to distinguish the public financing cases on the ground that they involve the propriety of conferring benefits in contrast to imposing penalties. She is fishing in an empty pond. For one thing, the distinction that Leonard struggles to draw between denying the carrot and striking with the stick is, in many contexts, more semantic than substantive. This case illustrates the point. The question whether Rhode Island's system of public financing imposes a penalty on non-complying candidates or, instead, confers a benefit on those who do comply is a non-issue, roughly comparable to bickering over whether a glass is half full or half empty. After all, there is nothing inherently penal about a $1,000 contribution cap.

For another thing, to the degree that the question does have a concrete answer, the answer appears contrary to the one Leonard suggests. Leonard has adduced no legislative history or other evidence suggestive of punitive purpose. Moreover, the Rhode Island statute sets up a $1,000 cap as the norm and doubles the cap only if a candidate meets certain conditions. Logic suggests that the higher cap is, therefore, a premium earned by meeting statutory eligibility requirements rather than a penalty imposed on those who either cannot or will not satisfy the requirements.

Third, the blurred line between benefit denials and penalties is singularly unhelpful in the zero-sum world of elective politics. Because a head-to-head election has a single victor, *any* benefit conferred on one candidate is the effective equivalent of a penalty imposed on all other aspirants for the same office. In the last analysis, then, Leonard's fancied distinction proves too much.

While these three reasons spell defeat for Leonard's attempt to distinguish the public financing cases as different in kind from this case, Leonard also proffers a difference-in-degree distinction. Even if some regulatory incentives may be permissible, she says, Rhode Island's incentives are so strong that they destroy the voluntariness of the public financing system and, therefore, cannot be condoned.

We agree with Leonard's main premise: voluntariness has proven to be an important factor in judicial ratification of government-sponsored campaign financing schemes. *See, e.g., Buckley*, 424 U.S. at 95, 96 S.Ct. at 671; *RNC I*, 487 F.Supp. at 285. Coerced compliance with fundraising caps and other eligibility requirements would raise serious, perhaps fatal, objections to a system like Rhode Island's. Furthermore, there is a point at which regulatory incentives stray beyond the pale, creating disparities so profound that they become impermissibly coercive. It is, however, pellucid that no such compulsion occurred here.

Rhode Island's law achieves a rough proportionality between the advantages available to complying candidates (including the cap gap) and the restrictions that such candidates must accept to receive these advantages.[14] Put another way, the state exacts a fair price from complying candidates in exchange for receipt of the challenged benefits. While we agree with Leonard that Rhode Island's statutory scheme is not in exact balance—we suspect that very few campaign financing schemes ever achieve perfect equipoise—we disagree with her claim that the law is unfairly coercive. Where, as here, a non-complying candidate suffers no more than "a countervailing denial," the statute does not go too far. *Buckley*, 424 U.S. at 95, 96 S.Ct. at 671.

To sum up, the implication of the public funding cases is that the government may legitimately provide candidates with a choice among different packages of benefits and regulatory requirements. Rhode Island has done nothing more than implement this principle. We see no sign that the state has crossed into forbidden territory; the contribution cap gap, as structured by the Rhode Island General Assembly, neither penalizes certain classes of office-seekers nor coerces candidates into surrendering their first amendment rights. In short, Leonard has identified no inherent constitutional defect in the state's voluntary, choice-increasing framework.

**2. The Burden/Justification Matrix.** Leonard keeps on trucking. She asserts that, even if the cap gap does not penalize or coerce, it nonetheless burdens her first amendment rights without sufficient justification. The assertion stalls.

In the first place, we have difficulty believing that a statutory framework which merely presents candidates with a voluntary alternative to an otherwise applicable, assuredly constitutional, financing option imposes any burden on first amendment rights. In choosing between the ordinary methods of financing a campaign—methods which are themselves subject to certain restrictions—and the public funding alternative—which limits both fundraising and expenditures—a candidate will presumably select the option which enhances his or her powers of communication and association. *See Buckley*, 424 U.S. at 92–93, 96 S.Ct. at 669–70; *RNC I*, 487 F.Supp. at 285. Thus, it seems likely that the challenged statute furthers, rather than smothers, first amendment values.

In the second place, even if the cap gap burdens a non-complying candidate's first amendment rights to some small extent, and assuming for argument's sake that the state bears the devoir of persuasion in respect to whether the statutory framework is both in service to a compelling governmental interest and tailored in a sufficiently narrow manner, we would still find Leonard's thesis unpersuasive. The state need not be completely neutral on the matter of public financing of elections. When, as now, the legislature has adopted a public funding alternative, the state possesses a valid interest in having candidates accept public financing because such programs "facilitate communication by candidates with the electorate," *Buckley*, 424 U.S. at 91, 96 S.Ct. at 669, free candidates from the pressures of fundraising, *see id.*, and, relatedly, tend to combat corruption. *See id.; see also RNC I*, 487 F.Supp. at 285–86. Establishing unequal contribution caps serves this multifaceted network of interests by making it more probable that candidates will choose to partake of public financing. Equally important, the gap appears to reflect a carefully calibrated legislative choice anent the differential risk of *quid pro quo* corruption in the two instances. In the state's view, the many eligibility requirements for public financing make it less likely that a given contribution will tend to corrupt a candidate.[15] That view, too, is plausible. Ergo,

---

**14.** Indeed, the specific facts of Rhode Island's 1992 gubernatorial contest support the conclusion that the state's catalog of incentives is neither overly coercive nor even especially attractive. Both Leonard and Governor Sundlun (who prevailed in the Democratic primary and eventually won the general election) resisted the temptations of public funding despite facing (a) an opponent in the primary who had opted for public funding and (b) a substantial possibility that the other party's candidate in the general election would be receiving such funds.

**15.** To cite an example, once it is clear that a publicly financed candidate's campaign can

the contribution cap gap stands on reasonably solid theoretical footing.

For these reasons, we find Rhode Island's contribution cap gap narrowly tailored and logically related, in scope, size, and kind, to compelling governmental interests.[16] That being so, it would be unduly meddlesome, hence, wrong, for us to substitute our own assessment of either an incentive's value or the perceived risks to which it is addressed for the considered judgment of a state legislature. *See Nat'l Right to Work,* 459 U.S. at 210, 103 S.Ct. at 561 (expressing reluctance to "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared"); *Baker v. City of Concord,* 916 F.2d 744, 750 (1st Cir.1990) (discussing impropriety of federal courts second-guessing a state's legislative judgments).

■ **3.** *Recapitulation.* We hold that states may sometimes legitimately confront candidates with the option of choosing among different packages of benefits and regulatory requirements. We hold further that such a permissible choice occurs where, as here, there is no credible evidence of a penalizing purpose, the choice between the packages is

real, uncoerced, and available to all, the status quo option, standing alone, raises no red flags, and the challenged disparity is narrowly tailored and logically related, in scope, size, and kind, to compelling governmental interests. *See, e.g., Buckley,* 424 U.S. at 29, 35–36, 96 S.Ct. at 640, 642–43 (upholding disparate contribution caps for individuals and PACs). Because Rhode Island's contribution cap gap does not penalize, coerce, or unjustifiably burden first amendment rights, the district court appropriately upheld the challenged provision.[17]

C. *The Free–Television–Time Provisions.*

We now examine Leonard's remonstrance against Rhode Island's offer of free television time to candidates who comply with the eligibility criteria for public financing. Since the issues are purely legal, we afford plenary review.

**1.** *Setting the Stage.* To understand the free-television-time incentives that have raised Leonard's hackles, a further exegesis is helpful. Under this heading, Leonard attacks two different grants of in-kind assistance to gubernatorial candidates who accept public financing. One such incentive is

reach the overall fundraising limits, *see* R.I.Gen. Laws § 17–25–20(2), any single contributor to that campaign becomes less important because the contributor can be "replaced" at no marginal cost. In other words, the fact that the campaign seems bound to reach the fundraising ceiling means that a given contributor is occupying a contribution slot that could as easily be occupied by someone else. With this distinction in the importance of individual contributors comes a corresponding diminution in the risk of corruption and, therefore, a diminished justification for stringent contribution limits. *See, e.g., Buckley,* 424 U.S. at 91, 96, 96 S.Ct. at 669, 671.

16. We add a caveat. We do not in any way imply that the contribution cap gap is constitutionally mandated. A state legislature could certainly conclude that a $2,000 contributor to a campaign complying with the spending limits actually holds a greater sway with the candidate than does a $1,000 contributor to an unlimited campaign because the former contribution represents, in most cases, a greater percentage of the candidate's kitty than does the latter. But, the legislature must have a certain amount of operating room in this sphere. The first amendment does not require the courts to choose sides, at this level of particularity, in the flux and reflux of policy considerations.

17. We do not tarry over Leonard's claim that the contribution cap gap violates her right to equal protection. First, the statute does not impose unequal treatment but gives candidates an authentic choice. Second, the statute treats candidates differently on the basis of their actions rather than their beliefs—actions which, as we have seen, possess differing implications for the integrity and effectiveness of the electoral process. The equal protection clause does not interdict such classifications. *See, e.g., Bray v. Alexandria Women's Health Clinic,* —— U.S. ——, ——–——, 113 S.Ct. 753, 760–62, 122 L.Ed.2d 34 (1993) (collecting cases illustrating courts' denials of equal protection claims despite statutes' unintended disparate effects on protected classes); *Buckley,* 424 U.S. at 95, 96 S.Ct. at 671 (upholding against equal protection attack a system which actually excluded minority party candidates); *Jenness v. Fortson,* 403 U.S. 431, 441–42, 91 S.Ct. 1970, 1975–76, 29 L.Ed.2d 554 (1971) (rejecting equal protection challenge to election law and observing that "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike").

limned in R.I.Gen.Laws § 17–25–30(1), which entitles a complying candidate to "free time on community antenna television" pursuant to rules to be formulated by the state Division of Public Utilities (DPU).[18] The second such incentive is outlined in R.I.Gen.Laws § 17–25–30(2), which entitles a complying candidate to "free time on any public broadcasting station" operating under the jurisdiction of the Rhode Island Public Telecommunications Authority (PTA).[19]

■■■■ *2. Preemption.* Leonard's attack on the free-television-time provisions proceeds on two fronts. Initially, she contends that the Federal Communications Act (FCA) preempts conflicting state laws, and that R.I.Gen.Laws § 17–25–30 comes within this proscription.[20] We find no such irreconcilable conflict.

The FCA reads in relevant part:

> If any licensee shall permit any person who is a legally qualified candidate for public office to use a broadcasting station [or CATV system], he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station [or CATV system].

47 U.S.C. § 315(a), (c). This guarantee of equal opportunity has both quantitative and qualitative dimensions. *See Paulsen v. FCC*, 491 F.2d 887, 889 (9th Cir.1974). Among other things, it "encompasses such elements as hour of the day, duration, and charges." *Kennedy for President Comm. v. FCC*, 636 F.2d 432, 438 (D.C.Cir.1980).

Whether this federal guarantee preempts Rhode Island's free-television-time provisions depends upon how one interprets state law. Leonard argues that in explicitly guaranteeing state-controlled television time to qualifying candidates at no cost, the state intends to exclude all other (non-publicly-funded) candidates from receiving comparable treatment. Any alternate interpretation of the statute, she claims, would render it purposeless.

We think Leonard's argument is deeply flawed. When a statute provides a benefit to some, it does not necessarily bar receipt of the benefit by others. *Cf., e.g., Bowen v. Owens*, 476 U.S. 340, 347, 106 S.Ct. 1881, 1886, 90 L.Ed.2d 316 (1986) (explaining that a legislative body "may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind") (citation and internal quotation marks omitted); *Baker*, 916 F.2d at 748 (holding that a state legislature may constitutionally elect to address "only one aspect or a few aspects of a multifaceted problem"). Put in concrete terms applicable to this case, the Rhode Island statute grants free television time to candidates who embrace public funding—but it does not purport to prevent privately financed candidates from reaping the same benefit if some other law—here, the FCA—requires equal treatment.

■■■■ It is, moreover, axiomatic that, when a state legislature has sounded an uncertain trumpet, a federal court charged with interpreting the statute ought, if possible, choose a reading that will harmonize the statute with constitutional understandings and over-

**18.** Community antenna television (CATV) is a form of television cablecasting regulated by the state DPU. *See* R.I.Gen.Laws § 39–19–6. Under current regulations and applicable franchise agreements, cable operators dedicate one or more CATV channels to the state to ensure public access. *See* DPU Rules Governing CATV Systems, § 14.1 (Jan. 14, 1983 rev.). The parties do not dispute the DPU's authority to write additional regulations implementing section 17–25–30(1) by providing free CATV time to candidates. By like token, the parties do not dispute that, if the DPU did promulgate such regulations, federal communications law would apply.

**19.** The state, through the PTA, owns and controls the air time provided by section 17–25–30(2). The PTA is a public corporation empowered to

hold property and licenses in trust for the state. *See* R.I.Gen.Laws § 16–61–2. As such, the PTA is required to "establish, own and operate" public broadcasting in the state, to "apply for, receive and hold" the necessary licenses from the Federal Communications Commission, and to exercise control over programming on public television stations. *See id.* at § 16–61–6. We take judicial notice that the PTA currently operates WSBE–TV, Channel 36.

**20.** Leonard does not argue that Congress preempted state regulation by occupying the entire communications field. *See, e.g., Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988); *French v. Pan Am Express, Inc.*, 869 F.2d 1, 4 (1st Cir.1989).

riding federal law. *See* 1A Norman J. Singer, *Sutherland Statutory Construction* § 23.21 (4th ed. 1985 & Supp.1993) (collecting Supreme Court cases); *EEOC v. Massachusetts*, 987 F.2d 64, 70 (1st Cir.1993). We believe these principles apply full bore to R.I.Gen.Laws § 17–25–30.

We refuse to read Rhode Island's provision of in-kind benefits in the overbold fashion that Leonard envisions. Instead, we interpret the statute to mean what it says and only what it says: it entitles publicly funded candidates to use state-controlled television channels without charge—but it does nothing to interfere with, and does not contemplate interfering with, the rights of privately financed candidates who wish to petition for equal time and treatment under 47 U.S.C. § 315. Contrary to Leonard's suggestion, this interpretation does not emasculate R.I.Gen.Laws § 17–25–30(1) & (2); indeed, by harmonizing the statutory provisions with federal law and avoiding possible preemption, the interpretation lends considerable vitality to the will of the state legislature. What is more, the provisions, so construed, further a substantial purpose: subsidizing all publicly funded candidates by providing them with access to free television time. In other words, the state law makes the public financing program more attractive not because complying candidates receive something which their non-complying counterparts do not, but, rather, because complying candidates can be confident that the expenditure limits imposed in consequence of the acceptance of public financing will not prevent them from getting their message to the voters.

The bottom line reads as follows: there are no indications—textual or otherwise—that Rhode Island's free-television-time provisions aim to preclude non-complying candidates from seeking either equal time or equal treatment; there is a plausible interpretation

of the state enactment which reconciles it with overriding federal law; and this interpretation gives the statute meaning without jeopardizing its validity. Because we read the state law in this way,[21] 47 U.S.C. § 315 does not preempt R.I.Gen.Laws § 17–25–30(1) & (2).

**3. *Excessive Entanglement.*** Leonard has one last shot in her sling. She urges that the provision of in-kind benefits, such as free television time, has a dangerous tendency to entangle government in the internal workings of political campaigns.

▆▆▆▆ The electoral process is guided by legislatively articulated rules designed to ensure fairness. A fine, but important, line exists between this salutary rulemaking and meddlesome interference in the conduct of elections. There is a point where government involvement in the operation of political campaigns may become so pervasive as to imperil first amendment values. Were a state to loan out its workers as campaign consultants, for example, voters and candidates might legitimately complain that it had gone beyond laying down general rules for office-seekers and begun tampering with, or even manipulating, the electoral process. Such entanglement could conceivably prevent the first amendment from accomplishing its fundamental mission in respect to political speech: "to secure the widest possible dissemination of information from diverse and antagonistic sources, and to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Buckley*, 424 U.S. at 49, 96 S.Ct. at 649 (citations and internal quotation marks omitted). In short, entanglement of this insidious stripe runs too great a risk of creating a convergence of pro-government voices.

Mindful of these concerns, courts must carefully review legislative enactments that

---

**21.** This interpretation of R.I.Gen.Laws § 17–25–30 requires that we reject three other disparity-presuming contentions advanced by Leonard. Read in the manner that we deem fitting, the statute neither (1) penalizes a candidate for exer-

cising his or her right to boycott public financing, (2) denies equal protection of the laws to such a candidate, nor (3) destroys the voluntariness of the public financing program.

potentially entangle government in partisan political affairs. In-kind incentives carry the seeds of potential overinvolvement, especially when they implicate access to state-run organs of communication. Nevertheless, the first amendment does not rule out all in-kind offerings simply because some of them may be too entangling. *See, e.g., id.* at 93 n. 127, 96 S.Ct. at 670 n. 127 (noting that the government's extension of postal privileges furthers first amendment values). Legislative bodies (and, ultimately, courts) must separate wheat from chaff, recognizing that, while some in-kind benefits may be excessively entangling, others represent valid and innovative attempts to confront new concerns in the ever-changing world of democratic elections.

In our view, there is a spectrum of government subsidization ranging from pure white and light gray—a range that would include such relatively unintrusive measures as supplying public funding on politically neutral terms—to jet black and navy blue—a range that would subsume such relatively intrusive measures as furnishing campaign workers to specific candidates. The closer an arrangement trenches to the non-intrusive end of the spectrum, the less likely it is to fall prey to a facial challenge grounded in the first amendment. After all, so long as interference is slight, offering in-kind benefits actually furthers first amendment values by increasing candidates' available choices and enhancing their ability to communicate. *See id.* at 92–93, 96 S.Ct. at 669–70.

In this case, Leonard has advanced no concrete reason for believing that the free-television-time provisions will excessively entangle the state in the day-to-day details and decisions of the campaign. Because applicable federal laws and regulations require equal time and treatment for all competing candidates insofar as the electronic media are concerned, there is no appreciable danger of lopsided state involvement in the intricate process of scheduling television appearances. By like token, there is no demonstrable risk that state power will influence candidates' speech in a way that undermines first amendment values. Accordingly, there is no

.

excessive entanglement. *See, e.g., id.* at 93 n. 126, 96 S.Ct. at 670 n. 126 (concluding that claims of excessive governmental involvement in respect to public funding of political campaigns were "wholly speculative and hardly a basis for [facial] invalidation").

## IV. CONCLUSION

In its journey to ensure the integrity of the electoral process, a state legislature must march across the hallowed ground on which fundamental first amendment rights take root. The terrain must be negotiated with circumspection and care: disparities, in whatever guise, are not casually to be condoned.

Here, the Rhode Island General Assembly traversed the minefield with mixed results. The disclosure threshold for PAC contributors, as contrasted with the different disclosure threshold for contributors to candidates, creates an impermissible disparity violative of associational rights. A second claimed disparity, involving the contribution cap gap is, in part due to its relatively small size, non-penalizing, non-coercive, justifiable, and, hence, constitutional. For all intents and purposes, the third claimed disparity is virtually non-existent: given the imperatives of extant federal law, the free-television-time provisions of the state statute do not produce significant differences in the benefits available to various candidates for the same office. Thus, we, like the court below, find that R.I.Gen.Laws § 17–25–15(c)(1) is unconstitutional, but that the plaintiffs' challenges to other portions of Rhode Island's campaign finance law are bootless.

*Nihilo ulterius requiremus pergere.* The judgment below will be

***Affirmed.***

### APPENDIX

**17–25–15. Political action committee—Notice of formation.**—(a) No political action committee shall accept any contributions or make any expenditures prior

to filing notice of its organization with the board of elections. The notice shall contain:

(1) The name or names of any candidates whose election or defeat the committee intends to advocate and/or the question or questions whose approval or rejection the committee intends to advocate;

(2) The names and addresses of all officers of the committee; and

(3) The mailing address or addresses of the committee.

(4) The goals and purposes of the political action committee; and

(5) A statement indicating whether the membership and/or contributor base the political action committee is derived primarily from the employees of one corporation or business entity or from one business or professional group or association or labor union and, if so, the identity of that employer or group or association or union.

(b) No committee shall advocate the election or defeat of any candidate or question other than that set forth in its notice of organization or amendment thereto. A political action committee may amend its notice of organization at any time. The board of elections shall prescribe forms in compliance with this section.

(c) In addition to all other reporting requirements, each political action committee shall include in each report required to be filed by this chapter:

(1) The source and amount of all funds received by the committee; provided however, that funds received through a regular payroll checkoff plan in which the aggregate contribution from each individual does not exceed one hundred dollars ($100) per calendar year shall report the name and address of each entity transferring such funds to the committee, the aggregate amount received from the payroll checkoff, and the total number of contributors; and

provided however, that funds received by the political action committee of a labor organization from the members of said labor organization in amounts not exceeding twenty-five dollars ($25.00) per calendar year from a single source shall be reported by the aggregate amount received and the total number of members of the labor organization contributing;

(2) The name and address of each person to whom expenditures were made, and the amount and purpose of each expenditure, and

(3) The name and address of each elected official and candidate for elected office to whom a contribution was made, and the amount of the contribution.

(d) The board of elections may reject the use by a political action committee of a name which is misleading and/or does not accurately identify the membership or contributor base of the committee.

(e) If a political action committee derives more than fifty percent (50%) of its funds from the employees, officers, directors, investors and/or stockholders of a corporation or other business entity, the name of said political action committee must incorporate the name of that corporation or business entity. If a political action committee derives more than fifty percent (50%) of its funds from persons affiliated with one industry, profession, trade organization, or association or labor union, the name of said political action committee must identify that industry, profession, trade organization or association, or labor union.

(f) Notwithstanding any provision to the contrary, a political action committee organized exclusively for the purpose of promoting or opposing a ballot question may expend in excess of twenty-five thousand dollars ($25,000) to promote or oppose that referendum, and shall not be subject to the requirement of making contributions to at least five (5) candidates, said political action committee shall terminate all activity

within thirty (30) days following that election.

**17-25-20. Eligibility criteria for matching public funds. [Version as amended by P.L.1992, ch. 21, § 1; and P.L.1992, ch. 203, § 1; effective until January 1, 1993.]**—In order to receive matching public funds under § 17-25-19 a qualifying candidate must comply with the following requirements:

(1) The candidate must sign a statement under oath, as provided for in the preceding section, pledging to comply with the limitations on contributions and expenditures for election purposes and with all the terms and conditions set forth herein. Upon the filing of the statement, a candidate for general office shall be bound to abide by the limitations on contributions and expenditures set forth in this chapter and may not withdraw from his or her obligation to abide by said restrictions.

(2) No participating candidate for governor shall either receive or expend for election purposes more than a total of public and private funds in the sum of one million five hundred thousand dollars ($1,500,000) in an election cycle.

The aforementioned limitations on contributions received from private sources, matching funds available from the state and total permitted expenditures shall apply in the 1992 general election and shall increase by ten percent (10%) in each succeeding general election.

(3) Only the first one thousand dollars ($1,000) of the aggregate private monetary contributions from a single private source within an election cycle shall be eligible for matching public funds; provided however the entire amount contributed shall be considered toward the dollar limits provided in subsection (2) herein.

Any private funds lawfully contributed subsequent to December 31, 1990 shall be eligible for matching public funds subject to the conditions of this subsection.

(4) The direct costs incurred in connection with raising campaign funds on behalf of a candidate shall not be deemed to be expenditures for the purposes of the limitations on expenditures set forth in subsection (2). Direct costs shall include costs of printing and mailing invitations to fundraising events, solicitations for contributions, costs of hosting fundraising events, and travel to those events, but shall not include any portion of the salary or wages of campaign employees, nor the cost of any radio, television or printed advertisement. The cost of a fundraising event must be less than the amount of money realized from the gross proceeds generated by the fundraising event in order to qualify for this exclusion.

(5) If a candidate who has accepted public funds makes expenditures in excess of the permitted amounts, the candidate shall be liable for a civil assessment payable to the state in an amount equal to three (3) times the amount of excess funds expended. In addition, the candidate shall be ineligible for further participation in the public financing program during the same election cycle.

(6) In order to receive payments under this section, any independent candidate shall first meet the following additional minimum requirements:

(a) Raise an amount in qualified private contributions equal to twenty percent (20%) of the total amount eligible to be matched for election as governor;

(b) Receive private contributions from a minimum of two hundred fifty (250) individuals contributing at least twenty-five dollars ($25.00) each; and

(c) Comply with any and all applicable nomination provisions in this title and qualify for the general election ballot pursuant to the process set forth in this title.

(7) No public funds received by any candidate pursuant to §§ 17-25-19 through 17-25-27 of this chapter and no private funds used to qualify for the public funds

shall be expended by the candidate for any purpose except to pay reasonable and necessary expenses directly related to the candidate's campaign.

(8) No public funds shall be expended by the candidate except for one or more of the following uses directly related to the campaign of the candidate:

(a) Purchase of time on radio or television stations;

(b) Purchase of rental space on outdoor signs or billboards;

(c) Purchase of advertising space in newspapers and regularly published magazines and periodicals;

(d) Payment of the cost of producing the material aired or displayed on radio, television, outdoor signs or billboards, and in newspapers, regularly published magazines and periodicals;

(e) Payment of the cost of printing and mailing campaign literature and brochures;

(f) Purchase of signs, bumper stickers, campaign buttons and other campaign paraphernalia;

(g) Payment of the cost of legal and accounting expenses incurred in complying with the public financing law and regulations as required by this chapter;

(h) Payment of the cost of telephone deposits, installation charges and monthly billings in excess of deposits;

(i) Payment of the costs of public opinion polls and surveys; and

(j) Payment of rent, utilities and associated expense connected with the operation of an election headquarters or satellite election offices.

(9) Contributions received and expended by any candidate for the purpose of defraying any expense or satisfying any loan obligations incurred prior to January 1, 1991 by the candidate in furtherance of his or her candidacy in a previous election cycle (as defined in § 17–25–3(k)) shall not be counted toward any contribution or expenditure limitation in §§ 17–25–18 through 17–25–27.

**17–25–30. Public financing of election campaigns—Compliance benefits.—** Any candidate eligible to receive public funds who shall comply in full with all eligibility criteria for receipt of such funds shall be:

(1) Entitled to an additional benefit of free time on community antenna television to be allocation pursuant to rules determined by the administrator for the division of public utilities. During all such allocated free time the candidate shall personally appear and present the message of the advertisement;

(2) Entitled to an additional benefit of free time on any public broadcasting station operating under the jurisdiction of the Rhode Island public telecommunications authority pursuant to rules determined by said authority. During all such allocated free time the candidate shall personally appear and personally present the message of the advertisement; and

(3) Entitled to accept a contribution or contributions which in the aggregate do not exceed two thousand dollars ($2,000) from any person or political action committee within a calendar year.