Richard Kennedy v. Wm.Gardner, et al. CV-96-574-B    06/05/98
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Richard E. Kennedy

            v.                                    C-96-574-B

William M. Gardner, et al.


MEMORANDUM AND ORDER

A candidate for state or federal office who is unwilling to abide by New Hampshire's self-described "voluntary" campaign expenditure laws must file a specified number of primary petitions and pay a filing fee when declaring his or her candidacy.  N.H. Rev. Stat. Ann. §§ 655:19, 655:20, & 655:22 (1996).  The primary petitions must include language informing signatories that the candidate may not have agreed to abide by the state's campaign spending cap.  N.H. Rev. Stat. Ann. § 655:20(II).  Candidates who agree to limit their expenditures are not subject to these requirements.  N.H. Rev. Stat. Ann. § 655:19-b (1996).[1]

Richard Kennedy, a candidate for the New Hampshire House of Representatives who will not agree to limit his expenditures, has

_____

[1]  I refer to these laws collectively as the "spending cap laws."

sued the officials responsible for administering the state's spending cap laws, contending that those laws violate his rights under the First and Fourteenth Amendments to the United States Constitution. Kennedy filed a motion on May 21, 1998, seeking to preliminarily enjoin the defendants from enforcing the spending cap laws against him.[2] Such relief is necessary now, he claims, because the filing deadline for candidates who wish to appear on the primary ballot is June 12, 1998.[3] For the reasons discussed below, I grant Kennedy's motion.

## I.  THE PRELIMINARY INJUNCTION STANDARD

I ordinarily must consider four factors in determining whether to grant a request for a preliminary injunction: "(1)

---

[2]  Kennedy originally sought only a temporary restraining order. He later orally amended his motion, however, to also seek preliminary injunctive relief.

[3]  Defendants have informed the court that the New Hampshire Legislature repealed the petition and filing fee requirements on June 4, 1998, insofar as they apply to candidates for state office. Although defendants have informed the court that the Governor intends to sign the repeal legislation, she apparently has not yet done so.

The repeal of an unconstitutional statute does not necessarily moot a challenge to the statute's validity. See City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982). Declaring the issue potentially moot is inappropriate here because the filing period has already begun and Kennedy should not have to further delay the declaration of his candidacy while he awaits the enactment of the repeal legislation.

2

the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant; (3) a balancing of the relevant equities, i.e., the hardship to the nonmovant if the injunction issues as contrasted with the hardship to the movant if the interim relief is withheld; and (4) the effect on the public interest of a grant or denial of the injunction." DeNovellis v. Shalala, 135 F.3d 58, 62 (1st Cir. 1998). In this case, however, I need only consider Kennedy's likelihood of success on the merits of his claim as defendants concede that he has satisfied the other requirements for preliminary injunctive relief.

## II. ANALYSIS

Kennedy argues that the state's spending cap laws impermissibly burden his First Amendment right to promote his candidacy. In effect, he claims that these laws impose an unconstitutional condition on his unfettered right to access the ballot by penalizing him unless he agrees to limit his right to spend on behalf of his campaign. Defendants respond by contending that the spending cap laws do not impair Kennedy's right to spend because the cap is voluntary. As I explain below, Kennedy's right to relief depends upon whether the spending cap

3

laws are unduly coercive and whether the condition they seek to impose -- an agreement to limit campaign spending -- bears some reasonable relationship to Kennedy's right to have access to the ballot.

In Buckley v. Valeo, 424 U.S. 1 (1976), the Supreme Court ruled that the government cannot impose a ceiling on the amount that a candidate may spend on his or her campaign. 424 U.S. 1, 19, 58-59 & n.67 (1976). In the words of the Court's per curiam opinion:

> The First Amendment denies government the power to determine that spending . . . [on a political campaign] is wasteful, excessive, or unwise. In the free society ordained by our Constitution[,] it is not the government, but the people individually as citizens and candidates and collectively as associations and political committees who must retain control over the quantity and range of debate on public issues in a political campaign.

Id. at 57. At the same time, the Court recognized that "Congress may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations." Id. at 57 n.65. The Court's opinion thus recognizes that in some circumstances the government may condition access to a benefit on the relinquishment of a constitutional right. Other cases support this view. See, e.g., Rust v. Sullivan, 500 U.S. 173,

4

192-94 (1991) (government may deny public health funding to organizations that engage in abortion counseling even though such counseling is protected by the First Amendment); Lyng v. International Union, UAW, 485 U.S. 360, 364-66, 369 (1988) (government may deny food stamps to otherwise eligible families because a family member has gone on strike); Wyman v. James, 400 U.S. 309, 324 (1971) (government may condition receipt of AFDC benefits on a recipient's agreement to consent to a warrantless search).

The government's power to impose conditions on the receipt of government benefits, however, is not without limitation. The Supreme Court has held, for example, that the government may not condition a tax exemption for veterans on an agreement to take a loyalty oath, Speiser v. Randall, 357 U.S. 513, 529 (1958); terminate a government employee for exercising First Amendment rights, Perry v. Sindermann, 408 U.S. 593, 597 (1972); or condition the provision of public broadcasting funds on the relinquishment of the right to editorialize, FCC v. League of Women Voters, 468 U.S. 364, 402 (1984). What distinguishes these decisions from Buckley and other cases upholding conditions on the receipt of government benefits is the coercive means used by the government in these cases to induce the plaintiffs to abandon

5

their constitutional rights.  See Kathleen M. Sullivan, Unconstitutional Conditions, 102 Harv. L. Rev. 1413, 1433-42 (1989) (discussing cases).

The Supreme Court also tests the legitimacy of conditions placed on the receipt of government benefits by asking whether a condition is germane to the benefit being conferred.  See id. at 1462-68.  Perhaps the clearest example is presented by the Court's opinion in Nollan v. California Coastal Comm'n, 483 U.S. 825 (1987).  There, the Court considered a state agency decision that conditioned the approval of a beach-house construction permit on the plaintiff granting an easement allowing the public to walk along his beach.  Id. at 828.  The agency conceded that its only legitimate interest in regulating the construction of beach houses was to preserve open views of the ocean from the road.  Id. at 835-36.  Even though the Court acknowledged that the state had the greater power to prevent the plaintiff from building the beach house, it invalidated the agency's arguably less-intrusive beach-access condition because the condition -- allowing the public to walk along the plaintiff's beach -- was not reasonably related to the state's interest in preserving

ocean views from the road.[4]  Id. at 838-39; see also Dolan v. City of Tigard, 512 U.S. 374, 394-95 (1994) (invalidating as unconstitutional a development condition that landowner dedicate portion of property lying in floodway for public bicycle path because condition lacked reasonable relationship to the state's interest in regulating the proposed development); Maher v. Roe, 432 U.S.  464, 475 n.8 (1977) (although government may deny funding for abortions, a regulation denying general welfare benefits to women who had had abortions and would otherwise be entitled to benefits would be subject to strict scrutiny).  Thus, as Nollan recognizes, a condition on the receipt of a government benefit will be deemed unconstitutional unless some reasonable relationship exists between the condition and the benefit being conferred.

The First Circuit Court of Appeals addressed the doctrine of

---

[4]  In invalidating the agency decision, the Court analogized the situation to one wherein the state banned shouting "fire" in a crowded theater but granted dispensation to those willing to contribute $100 to the state treasury.  Nollan, 483 U.S. at 837. "[A] ban on shouting fire can be a core exercise of the State's police power to protect the public safety, and can thus meet our stringent standards for regulation of speech . . . ."  Id. "[A]dding the unrelated condition," however, alters the purpose of the ban to one aimed at raising tax revenue, "which [even if] legitimate, is inadequate[ly related to the condition] to sustain the ban."  Id.  That the state has a legitimate interest is of no avail where the condition serves an entirely different, unrelated purpose.  Id.

unconstitutional conditions in the context of a campaign spending cap law in <u>Vote Choice, Inc. v. DiStefano</u>, 4 F.3d 26 (1st Cir. 1993). At issue was a Rhode Island law that in exchange for a gubernatorial candidate's agreement to abide by an overall spending cap, offered the candidate public financing, free television time, and the ability to solicit larger individual campaign contributions than could candidates who did not agree to the spending cap. <u>Id.</u> at 29-30. In upholding the law against a First Amendment challenge, the court concluded that the Rhode Island law was not coercive, but instead offered candidates a true choice "among differing packages of benefits and regulatory requirements." <u>Id.</u> at 39. In other words, the court determined that the Rhode Island law did not violate the First Amendment because it gave candidates a choice between retaining the right to raise and spend an unlimited amount of money subject only to valid contribution limitations, and limiting that right in exchange for a package of benefits to which the candidate would not otherwise be entitled.[5]

---

[5] The court did not consider whether the spending limitation condition was germane to the benefits being conferred. The germaneness requirement would easily have been satisfied in <u>Vote Choice</u>, however, as the package of benefits Rhode Island offered to candidates who agreed to limit spending were all directly related to the issue of campaign spending.

New Hampshire's spending cap laws differ from the statutory schemes at issue in <u>Buckley</u> and <u>Vote Choice</u> both because the state has chosen a coercive means to achieve adherence to its spending cap and because the condition those laws impose on gaining access to the ballot -- limiting the constitutional right to make campaign expenditures -- bears no reasonable relationship to any legitimate reason for controlling ballot access.

Rather than choosing to encourage compliance with a spending cap by providing incentives such as public financing or free television time, New Hampshire has opted to penalize non-complying candidates by making it more difficult for them to gain access to the ballot. The state's choice of methods is important to Kennedy's constitutional claim because unlike benefits such as public financing, to which no candidate has a constitutional entitlement, both candidates and the voters they seek to serve have a constitutionally-protected interest in ensuring that candidates are not unreasonably denied access to the ballot. <u>Anderson v. Celebrezze</u>, 460 U.S. 780, 787-88 (1983); <u>Buckley</u>, 424 U.S. at 94. Accordingly, as the Court recognized in <u>Buckley</u>, laws that restrict ballot access are inherently more coercive than laws conditioning access to other benefits such as public financing. 424 U.S. at 94 & n.128, 95.

9

Defendants argue that the spending cap laws cannot be considered coercive because candidates for the office of state representative who are unwilling to abide by the cap need only file ten nominating petitions and pay a $25.00 filing fee in order to gain access to the ballot. See N.H. Rev. Stat. Ann. §§ 655:19(I)(e) & 655:22. I disagree. Although it is unlikely that any serious candidate would be deterred by these requirements, the petition and filing fee requirements undeniably are targeted only at those candidates who are unwilling to limit their constitutional right to spend in support of their campaigns. Under these circumstances, it is not the magnitude of the penalty, but rather the fact that the state has attempted to punish candidates who will not abandon their constitutional rights that makes the spending cap requirements coercive. See, e.g., Shrink Missouri Government PAC v. Maupin, 71 F.3d 1422, 1426 (8th Cir. 1995) (law preventing candidates who will not agree to limit expenditures from accepting contributions from political action committees and requiring such candidates to file daily disclosure reports is impermissibly coercive).[6]

_____

[6] To illustrate the point, assume that New Hampshire attempted to impose a one cent tax on every one hundred dollars a candidate chose to spend above a designated cap. Although the penalty imposed would not be severe, such a tax, without question, would be coercive and in violation of the candidate's

10

New Hampshire's spending cap laws are also improper because the condition the laws seek to impose bears no reasonable relationship to the advantage they give to candidates who agree to limit their spending. States have a legitimate interest in regulating access to the ballot to reduce voter confusion and eliminate frivolous candidates. See, e.g. American Party of Texas v. White, 415 U.S. 767, 781 (1974); Storer v. Brown, 415 U.S. 724, 732-33 (1974). Defendants do not allege, however, that New Hampshire's ballot access restrictions serve either purpose. Further, while the declaration of purpose that accompanied the spending cap legislation suggests that the legislation's restrictions are justifiable because they will somehow broaden access to the ballot, see 1991 N.H. Laws 387:1, it is difficult to see how this could be so. Certainly, the spending cap laws might entice some people to run for office who would not otherwise become candidates. At the same time, however, the laws might drive away potential candidates who are unwilling to cede their constitutional right to spend on behalf of their campaigns. In any event, the imposition of ballot access restrictions on

_____

First Amendment right to promote his candidacy. Accordingly, it is not the magnitude of the penalty but the fact that it is imposed to burden the exercise of a constitutional right that renders a condition impermissibly coercive.

11

noncomplying candidates do not make it easier for complying candidates to gain access to the ballot. Accordingly, the spending cap laws are unlikely to survive Kennedy's First Amendment claim because they do not bear a reasonable relationship to any legitimate reason for regulating ballot access.

## III. <u>CONCLUSION</u>

In summary, the state remains free to offer candidates a "choice among different packages of benefits and regulatory requirements" in order to encourage compliance with the state's spending cap. <u>Vote Choice</u>, 4 F.3d at 39. The state may not, however, coerce compliance by attempting to penalize candidates who will not comply voluntarily. Nor may it impose conditions on gaining access to the ballot that bear no reasonable relationship to any legitimate reason for regulating ballot access. As it appears that New Hampshire's spending cap laws fail to meet these standards, I find Kennedy is likely to succeed on the merits of his claim that the laws are unconstitutional. As the other prerequisites to the issuance of a preliminary injunction are not in dispute, I grant Kennedy's motion. Accordingly, defendants are preliminarily enjoined from requiring Kennedy to file the

primary petitions required by N.H. Rev. Stat. Ann. §§ 655:20(II) and 655:22 and pay the filing fee required by N.H. Rev. Stat. Ann. § 655:19(I)(e).

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

June 5, 1998

cc:  Philip T. Cobbin, Esq.
     William C. Knowles, Esq.
     Wynn E. Arnold, Esq.