TORRUELLA, Chief Judge,
concurring.
Although I agree with the majority’s affirmance of the district court’s dismissal of this action, I would not have reached the merits of this case, because I believe Ralph Nader lacks standing for the reasons stated herein. Even if Nader has standing, I would find that there is no Article III case or controversy here, as Nader’s claim is moot at this point in the litigation.
I.
Standing doctrine embraces both constitutional mandates and prudential considerations.[1] See Allen v. Wright, 468 U.S. 737, *398 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1983). When a plaintiff lacks standing in a constitutional sense, this Court lacks jurisdiction under Article III. See Warth v. Seldin, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The constitutional component of standing derived from Article III requires that “a plaintiff ... allege personal injury fairly traceable to the defendant’s allegedly unlawful conduct and likely to be redressed by the requested relief.” Allen, 468 U.S. at 751, 104 S.Ct. 3315. In other words, the plaintiff must show (1) “actual or threatened injury as a result of the defendant’s putatively illegal conduct,” (2) “that the injury may fairly be traced to the challenged action,” and (3) “that a favorable decision will redress the injury.” Vote Choice Inc. v. DiStefano, 4 F.3d 26, 36 (1st Cir.1993). Although these concepts are admittedly “not susceptible of precise definition,” Allen, 468 U.S. at 751, 104 S.Ct. 3315, our case law has provided a sufficient outline of the standing map to address this petitioner.
The extent and type of injury required for constitutional standing is not easily defined. It must at the very least be “distinct and palpable,” id. (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)), arid not “abstract,” “conjectural,” or “hypothetical,” id. (quoting Los Angeles v. Lyons, 461 U.S. 95, 101-02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); O’Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). As I read his claim, Nader asserts two distinct theories of injury. First, he claims an injury derived from the “coercive choice” potentially posed by the allegedly illegal debate regulations. According to Nader, if he is invited to participate in the debates, he will be forced into a Hobbesian choice: either compromise of his corporate watchdog platform or loss of an important avenue for communication. Second, Nader claims injury as a political competitor: opponents invited to the debate benefit directly from allegedly illegal corporate sponsorship.
The problem with the majority approach, as I see it, is that the majority found standing here by collapsing these two very separate theories. If he had been invited to the debate, Nader may indeed have faced a choice between accepting corporate sponsorship and losing free national exposure. However, as he was not invited to the debate, he did not face this choice; he cannot be injured by any coercive effect it might have had, or by any strategic changes to his campaign such a choice might entail. Likewise, it is surely true that Nader was at a competitive disadvantage because his opponents participated in the debates. He may have had to alter his strategy to cope with the free air time that they receive. However, to the extent that’ Nader faces this problem, it is because he is a political competitor, not because he faces a coerced choice under the Vote Choice analysis; his unwill *399 ingness to participate in the debates if invited did not affect Nader’s response to this free air time. And as I discuss below, his injury as a political competitor is not traceable to the challenged regulations because he cannot show that the debates likely would not occur without the corporate sponsorship.[2]
A.
I began by addressing the “coerced choice” theory. Relying on Vote Choice, Nader claims that the allegedly impermissible regulation coercively impacted the strategy and conduct of his presidential campaign. In Vote Choice, Elizabeth Leonard, a Rhode Island gubernatorial candidate, challenged a set of state campaign finance laws that: (i) required candidates upon declaring their candidacy to make an irrevocable election whether to use public funds; (ii) forced candidates electing to use public funds to sign an irrevocable pledge to abide by various terms and conditions of the fund grant; and (iii) created significant differences in legally allowed contributions between those who accepted and those who did not accept public funding (a so-called “contribution cap gap”). Although Leonard had not accepted the public funding and never actually faced a publicly funded opponent, we found that she retained standing to challenge the public funding provisions. We reasoned that “when declaring her candidacy, Leonard had to make an irrevocable commitment” as to her use of public funding. Vote Choice, 4 F.3d at 36-37. As a result, she had to plan her campaign strategy based on the possibility that her opponent (perhaps an undeclared one) would make the opposite choice; “the coerced choice between public and private financing colored her campaign strategy from the outset.” Id. We concluded that “such an impact on the strategy and conduct of an office-seeker’s political campaign constitutes an injury of a kind sufficient to confer standing.” See id.
Nader argues, and the majority agrees, that the allegedly illegal corporate contributions to the debate organizing entity create a coercive choice of the type in Vote Choice, and thus standing follows. However, there is an important distinction between the two situations. Vote Choice did not grant Leonard standing simply because of the benefits given to her publicly funded opponents under Rhode Island campaign finance law. To do so would have premised standing on Leonard’s injury as a political competitor; that is, it would have found injury due to the additional benefits accrued by her opponents. Such a theory may be viable here, and I discuss it below. Vote Choice, however, *400 premised standing on the fact that Leonard’s choice not to accept such benefits shaped her strategy throughout the race. In other words, because Rhode Island provided allegedly unlawful incentives to accept public funding, a candidate could challenge those incentives even if they did not ultimately rely on them. But in the present case, Nader was not coerced into making this choice in fact, he has been saved from coercion by the lack of sufficient public support to meet the threshold set by the Commission on Public Debates (the “CPD”). Unlike Leonard, whose campaign strategy was altered by an irrevocable choice made at the start of her campaign, Nader never faced such a dilemma. If he had, I would have found standing under Vote Choice.
However, the majority finds potential coercion even when none actually exists. In my view, by creating a present harm from the possibility of a future one, they dangerously expand our standing jurisprudence. The majority begins with the theory that because Nader has chosen not to accept corporate contributions, he was barred from the debates - at the time the CPD accepted corporate donations, whether he proved ultimately eligible or not. If the debates were not funded by corporations, however, Nader would have been able and willing to participate if he had been invited. This seems plausible to me. However, the majority continues, this “threat” of being forced to decline a debate invitation in the future “had a palpable and immediate impact on [Nader’s] campaign strategy and expenditures,” namely that Nader spent “more on advertising than he would [have] if there remained a chance that he could appear in the debate.” I agree with the majority that it is not generally proper for this institution “to second-guess a candidate’s reasonable assessment of his own campaign.” However, I am not willing to grant a petitioner seeking standing free reign to allege changes in strategy forced only by the possibility of future events. Much as our standing jurisprudence requires the injury to be “distinct and palpable,” Allen, 468 U.S. at 751, 104 S.Ct. 3315, I believe that a strategic harm argued under Vote Choice must be more than a mere potentiality. And unlike the majority, I find something “improbable” about the proposition that a threatened choice three months in the future impacted Nader’s strategy at the time of the complaint.
Let me expand. In June of 2000, at the time he filed this complaint, Nader admittedly failed to meet the eligibility requirements set by the CPD in January of 2000.[3] Specifically, he had not reached the 15% popular opinion threshold, although some polls had him in the 6% range. See Frank Newport, Gallup News Service, Poll Releases (October 23, 2000), available at http://www.gallup.com/poll/releases/pr 001023.asp. In June, Nader’s potential strategies were thus either to attempt to reach the 15% threshold, so that he would be eligible for the free exposure of the debates, or not to attempt to reach the 15% threshold. However, given that he was running for President of the United States, the latter choice does not seem a viable one — whether or not he received a debate invitation. Moreover, Nader has never asserted that, because he would not accept a debate invitation under any circumstances, he resigned himself to a failed campaign that would never reach the 15% mark.
Even ignoring the infirmities of this theory of strategic impact, I note that Nader has not alleged that his campaign strategy was so affected by the potential choice which he faced. His main brief merely asserts that “Nader and his organizational supporters have been forced to adjust their campaign strategy to compensate for the benefits conferred upon Nader’s com *401 petitors by the Debate Regulations” (emphasis added). In Nader’s reply brief, he explains the strategic impact of the regulations in slightly more detail: “Nader has been forced to spend more of his campaign’s money on advertising in order to overcome the free television time that candidates Bush and Gore have and will continue to receive as debate participants.” In this regard, Nader is correct: the fact that his opponents will participate in the debates and that he will not (either because he is not invited or because he chooses not to) means he will have to spend additional advertising funds to match their free television time. However, Nader’s phrasing indicates that the strategic impact of the debate regulations, in his mind, is only related to the receipt of illegal (according to him) money by his opponents. Nader says nothing about planning for the possibility of receiving free debate time; he has apparently assumed that he will not compete and formed his campaign strategy based on that assumption. This is very different from the strategic impact proposed by the majority, and it is also foreign to our analysis in Vote Choice. At base, Nader is claiming injury as a political competitor; the majority’s attempt to dress it as a future choice with a present strategic impact is misguided and not supported by either appellant’s brief or their approach at oral argument. Furthermore, unlike in Vote Choice, the district court here failed to make clear findings of strategy, simply noting that appellants had alleged a strategic harm. See Becker v. FEC, 112 F.Supp.2d 172, 178-79 (D.Mass.2000). Even if it is inappropriate for a court to evaluate the actual impact of a choice on a candidate’s strategy, and even if a court should accept the candidate’s assessment of the impact at face value with hardly any inquiry, we need not premise injury on a supposed strategic impact not even argued by the petitioner.
In short, I find that theoretical injury caused by potential future choices is the type of injury the Supreme Court warned against in Lujan. In Berner v. Delahanty, 129 F.3d 20 (1st Cir.1997), we noted specific hurdles for abstract harms such as this:
The [Supreme] Court placed a special gloss on cases in which a party seeks exclusively injunctive or declaratory relief. In such purlieus, standing inheres only if the complainant can show that he has suffered (or has been threatened with) “an invasion of a legally protected interest which is ... concrete and particularized,” Lujan, 504 U.S. at 560, 112 S.Ct. 2130, together with “a sufficient likelihood that he will again be wronged in a significant way,” Lyons, 461 U.S. at 111, 103 S.Ct. 1660. In other words, the complainant must establish that the feared harm is “actual or imminent, not conjectural or hypothetical.” Lujan, 504 U.S. at 560, 112 S.Ct. 2130. It bears noting that the imminence concept, while admittedly far reaching, is bounded by its Article III purpose: “to ensure that the alleged injury is not too speculative.” Id. at 564 n. 2, 112 S.Ct. 2130.
I do not find that Nader has made a sufficient showing of a “concrete and particularized” injury; the unfocused “threat” of a coerced choice sometime hence is much like the overly speculative “ ‘some day’ intentions” that the Supreme Court found lacking in Lujan. Id. at 564, 112 S.Ct. 2130.
The problem of abstractness and lack of imminence is further revealed by the opening the majority creates for future litigants. Because the majority analysis places its present harm in the possibility of a future choice, anyone that could face the future choice must have the same injury. No language in the majority necessarily restricts this to candidates with a significant chance of facing the future choice; presumably, the possibility of this choice affected Nader’s strategy prior to June. It theoretically could have altered his decision even to enter the race. In expanding standing to Nader here, the majority grants standing to any political entrant to *402 challenge any election regulation to which they might someday be subject.[4]
B.
Nader’s second theory of standing is not based on the strategic underpinnings of his own campaign, but on the theory that the corporate contributions to the CPD imper-missibly help his competitors, essentially providing Gore and Bush with inexpensive access to extensive media coverage. The theory that a political competitor incurs injury because of an impermissible benefit to his opponent is premised on a line of cases granting standing to economic competitors. See, e.g., Clarke v. Securities Indus. Ass’n, 479 U.S. 388, 403, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).
Courts have, however, been reluctant to adopt this “political competitor” theory of standing, not so much because the injury faced by a plaintiff is not a real one, but because that injury generally cannot be traced to the challenged regulation, nor is the injury usually redressable by invalidating the regulation. Three cases pursued by minor party candidate Lenora Fulani indicate the contours of this standing doctrine. In Fulani v. League of Women Voters Educ. Fund, 882 F.2d 621 (2d Cir.1989), the Second Circuit found that Fulani had standing to challenge the tax-exempt status of the League of Women Voters. Fulani claimed that the League’s refusal to include her in debates deprived her of critical media exposure and competitive advantage, as well as the opportunity to communicate her political ideas to the electorate. The court found that:
[T]he loss of competitive advantage flowing from the League’s exclusion of Fulani from the national debates constitutes sufficient “injury” for standing purposes, because such loss palpably impaired Fulani’s ability to compete on an equal footing with other significant presidential candidates. To hold otherwise would tend to diminish the import of depriving a serious candidate for public office of the opportunity to compete equally for votes in an election, and would imply that such a candidate could never challenge the conduct of the offending agency or party.
Fulani v. League, 882 F.2d at 626. The Second Circuit then found that the other prerequisites for standing were met, because removing the League’s not-for-profit status would end the League’s ability to sponsor debates, and probably would have meant the absence of any debates in the 1988 campaign season.
In Fulani v. Brady, 935 F.2d 1324 (D.C.Cir.1991) and Fulani v. Bentsen, 35 F.3d 49 (2d Cir.1994), both the Second and the D.C. Circuits cut back on this approach, in cases more nearly mirroring our own. In Fulani v. Brady, Fulani sought standing to challenge the tax-exempt status of the CPD based on its decision that she lacked a realistic chance of being elected President, and its concordant refusal to invite her to the 1988 presidential debates. The D.C. Circuit focused its inquiry on the fact that Fulani was challenging a tax exemption, and noted strong judicial precedent against the ability to challenge the tax treatment of a competitor. See id. at *403 1327. In particular, Fulani could not meet the standing requirements of traceability and redressability: first, many factors beyond the tax-exempt status of the CPD were influential in excluding Fulani from the debates; second, revocation of the tax-exempt status of the CPD would not necessarily have any impact on the purportedly unfair provision of media coverage to the major party candidates. See id. at 1328-29. Although Nader is not challenging a tax exemption, his claim is once removed because it does not challenge the entity hosting the debate (the CPD) but that entity’s source of funds. At best, a Nader victory here could require the CPD to find other sources of funds; it would not necessarily reduce his opponent’s television exposure, nor would it likely cancel the debates.
In Fulani v. Bentsen, Fulani again challenged the tax status of the League. However, the Second Circuit, noting that the debate in question was co-sponsored by CNN, refused to find injury based on “the alleged incremental advantage accorded participants in debates in which the League plays a sponsoring role.” Id. at 52-53. In other words, the fact that Fulani’s competitors might benefit from the accouterments of League sponsorship was insufficient to create standing. Similarly, the fact that Nader’s competitors may gain incremental advantages through their association with corporate sponsors is an insufficient basis for standing, given that a decision by this Court will have little or no impact on the exposure they gain due to the debate.
Moreover, the Second Circuit has indicated that for a plaintiff to gain standing as a political competitor, he must “personally compete in the same arena with the same party to whom the government has bestowed the assertedly illegal benefit.” In re United States Catholic Conference, 885 F.2d 1020, 1029 (2d Cir.1989). In this case, the benefit has perhaps been conferred upon the sponsoring. corporations, who at the most are allowed to further their political viewpoint by sponsoring a two-person debate, and at least are given additional air-time for their beer and pretzels. Perhaps the benefit has been conferred upon CPD, the entity which receives the allegedly illegal contributions. Nader would argue that Gore and Bush receive the unlawful benefit, and that as their competitor he has standing. However, Fulani v. Bentsen explicitly refused to extend the competitive standing rule to encompass this removed level of competition. Id. at 54 (“We decline to extend the rule of Catholic Conference to encompass not only a plaintiffs competitors in a defined arena, but also any entity that provides a tangential benefit to those competitors.”). Nader does compete with Bush and Gore, who may or may not have received tangential benefits from corporate sponsorship of the debates; however, I fear that expanding competitor standing to this extent gives plaintiffs the ability to challenge a host of regulations that, while undoubtedly having incidental beneficial effects on their competitors, are not traceable to a concrete, particularized harm. See Catholic Conference, 885 F.2d at 1028; see also Gottlieb v. FEC, 143 F.3d 618, 621 (D.C.Cir.1998) (AmeriPAC could not challenge matching funds received by the Clinton campaign, because it was never in a position to receive such matching funds itself).
C.
The majority rues the fact that this analysis “leads to the result that no candidate could ever challenge the FEC regulations in question here, regardless of how likely he or she was to be invited to the debate.” First, I dispute this premise. Although no candidate may be able to challenge the regulations under a political competitor theory of 'standing, it is certainly possible that a candidate would have standing under the Vote Choice theory, if he or she actually faced a coerced choice. If Nader had reached the 15% mark, been invited to debate, and then refused to do so, I would *404 be tempted to find standing here. A1 Gore or George W. Bush could potentially have challenged the regulations as well. Furthermore, under the competitor theory, a rival debate organization or a potential non-corporate sponsor that could not afford the CPD’s sponsorship prices might have successfully defended their standing as an economic competitor. In any event, even in the majority’s refusal to read Vote Choice as implying that “the regulations might effectively be immune from judicial review,” the majority admits that the fact that the plaintiff might be the best person to have standing does not in itself give them standing. See Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 489, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).
I do not doubt “the powerful beneficial effect that mass media exposure can have today on the candidacy of a significant aspirant seeking national political office.” Fulani v. League, 882 F.2d at 626. But this effect alone is insufficient to confer standing on such an aspirant simply because his claim is related to this mass media exposure.
II.
The majority gives short shrift to the question of mootness, stating conclusively that “this sort of case qualifies for the exception to mootness for disputes ‘capable of repetition, yet evading review.’ ” I have no quarrel with the claim that this case is capable of repetition: under the majority’s theory of standing, in fact, it is all too capable of repetition as any candidate or potential candidate could claim that their strategy is affected by the potential that they will be subject to a choice down the campaign trail.
The Supreme Court has indicated that election cases are particularly privy to this mootness exception. See Storer v. Brown, 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 39 L.Ed.2d 714; Rosario v. Rockefeller, 410 U.S. 752, 756 n. 5, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973); Dunn v. Blumstein, 405 U.S. 330, 333 n. 2, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). However, all of these cases involved burdens placed on candidates or voters in order for them to participate in the election process, an inherently time-sensitive issue.[5] For example, in Storer, petitioners challenged ballot access and nomination procedures necessarily occurring between the primary and the general election. See id. at 726-28, 94 S.Ct. 1274; see also Rockefeller, 410 U.S. at 752-56, 93 S.Ct. 1245 (similar issue). Dunn involved a challenge to state residency requirements which a would-be voter might not be able to challenge until just before the election, and which would without the exception become moot immediately after the election. See id. at 333-34, 92 S.Ct. 995. In Fulani v. League, Fulani’s standing arose only at the time she was not invited to the debates, which meant that not enough time remained to litigate prior to the debates being held. See id. at 628. It is ironic that the very rationale which the majority used to grant Nader standing should now (I believe) lead them to find mootness. Under the majority’s new standing jurisprudence, Nader could have brought his suit at any time after announcing his candidacy and possibly before doing so. A future petitioner who faces this same strategic problem will have ample time to sue in a manner so that we can redress his injury if appropriate.
Moreover, the procedural history of this case indicates that future cases in which *405 standing arises will not necessarily evade our review. Nader’s complaint was filed on June 29, 2000. However, oral argument was not until six weeks later, on August 14, 2000. The argument was delayed by both the recusal of the original assigned judge and by at least one unopposed motion to extend time (made by the FEC). Although the district court issued its Memorandum and Order relatively quickly, on September 1, 2000, two more weeks passed until a final judgment was entered on September 18, 2000. This Court granted expedited review and oral arguments were heard on October 5, 2000. Although we have not issued our opinion until now, we certainly could have done so with more alacrity if it had proved necessary. Given the procedural history of this case, it can hardly be said that an Article III case or controversy on the issues raised would not be capable of full litigation and appellate review in a sufficient time to prevent mootness.
This case should never have reached the merits of the challenge to the FEC regulation. Nader lacked standing, either because his injury was hypothetical, or because his injury, although potentially real, was not traceable to the challenged regulations and not redressable by the invalidation of the challenged regulations. Moreover, by the time the litigation reached this court, Nader’s harm had become moot. Although I agree with the majority that this appeal should be dismissed, I would not have reached the merits.

. Throughout, the majority examines Nader’s situation in June, when this lawsuit was filed, under the assumption that standing is measured only at the time of filing. Although some cases hold lhat standing is only measured at that time, other cases point in the opposite direction, i.e., that a petitioner must retain standing throughout the litigation. See, e.g., Powder River Basin Resource Council v. Babbitt, 54 F.3d 1477, 1485 (10th Cir.1995). Such a conclusion would seriously complicate the majority's approach; far before oral argument it was quite clear that Nader would not receive an invitation to the debate, and thus his campaign strategy was determined without any influence of a potential choice.
Although the majority suggests that Powder River no longer provides any authority because of the Supreme Court's intervening decision in Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), I note that although the Court described standing as "[t]he requisite personal interest that must exist at the commencement of the litigation,” id. at 709, it also did “not license courts to retain jurisdiction over cases in which one or both parties plainly lacks a continuing interest,” id. at 710. Friends of the Earth thus distinguished standing from mootness, but primarily to indicate that because the mootness analysis occurs at the end of litigation, there are important differences between the two doctrines. See id. My point here, which is supported by Powder River and not directly contradicted by Friends of the Earth, is that when standing disappears in the early stages of litigation, we should perhaps dismiss for lack of standing even if it may have existed at the time of the complaint.

. These eligibility requirements were: (i) constitutional eligibility; (ii) appearance on a sufficient number of state ballots to achieve an Electoral College majority; and (iii) a level of support exceeding 15% according to major national polls. See Joint Appendix 174-76.

. Although the majority contends that its holding is "nowhere near so broad” as I have suggested, I am unconvinced. Their basic point is that potential choices in the future can alter strategy today, and that forced changes in strategy today can meet the injury requirement for standing. I see no clear way of distinguishing Nader’s "plausible” hope that he would be invited to the debates "at a definite date” in the future, from perhaps slightly less plausible (but still possible) hopes that may occur at a more distant time.
For example, Nader is running for President. Presumably, issues affecting the President of the United States inform his decision to run, which is undoubtedly part and parcel of his campaign strategy. Yet I doubt very much that the majority would grant Nader standing to challenge, say, the calculation of the presidential salary, simply because he may potentially be subject to its dictates. However, I believe that the majority's theory of standing would require them to do so if Nader asserted that such issues altered his current campaign strategy.

. In addition, these election exceptions to mootness involved First Amendment constitutional challenges, an area afforded special treatment by the Court’s standing and mootness jurisprudence. See, e.g., Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) In contrast, Nader does not raise a First Amendment challenge of any sort, but simply challenges the legality of FEC regulations. The majority recognizes this distinction, but chooses to rely upon it to find an exception here.