# United States Court of Appeals
## For the First Circuit

Nos. 12-1189
     12-1277

HERNAN MATAMOROS ET AL.,

Plaintiffs, Appellees/Cross-Appellants,

v.

STARBUCKS CORPORATION,

Defendant, Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

[Hon. Leo T. Sorokin, U.S. Magistrate Judge]

Before

Thompson, Selya and Lipez,
Circuit Judges.

Rex S. Heinke, with whom Daniel L. Nash, Nathan J. Oleson, Gregory W. Knopp, Akin Gump Strauss Hauer & Feld LLP, James C. Rehnquist, Elianna J. Nuzum, Robert M. Hale and Goodwin Procter LLP were on brief, for defendant.
     Shannon Liss-Riordan, with whom Hillary Schwab and Lichten & Liss-Riordan, P.C. were on brief, for plaintiffs.

November 9, 2012

**SELYA**, <u>Circuit Judge</u>.  As society matures and employment law evolves, legislatures have lavished more attention on the policies and practices used by employers with respect to customer gratuities.  Massachusetts is in the regulatory forefront on these cutting-edge issues.

In the matter at hand, the district court, applying Massachusetts law in a class-action diversity case, concluded that the most recent version of the Tips Act, Mass. Gen. Laws ch. 149, § 152A, says what it means and means what it says.  Consequently, the court ruled that the defendant's policy regarding pooled gratuities violated the Act, certified a class, and awarded damages in an amount exceeding $14,000,000.  After careful consideration of a fundamental (and previously unanswered) interpretative question, we hold that the plain language of the Tips Act prohibits the defendant's tip-pooling policy.  We also reject the parties' other claims of error.  When all is said and done, we leave the combatants where we found them.

## I.  BACKGROUND

We sketch the background and travel of the case, reserving salient details for our discussion of the substantive issues.

Starbucks Corporation operates a national chain of upscale coffee houses including approximately 150 outlets in Massachusetts.  Starbucks euphemistically describes the employees

who staff its shops as "partners." Within that designation, however, employees are divided into four subcategories: store managers, assistant managers, shift supervisors, and baristas. Both shift supervisors and baristas are hourly wage employees, often working part-time. There are both similarities and differences between these two classifications: baristas are front-line employees who serve food and beverages to customers; shift supervisors perform those functions and other functions as well. The classifications are hierarchical, and shift supervisors are usually promoted from the ranks of baristas.

Pursuant to company policy, Starbucks' stores maintain tips containers in which customers may deposit tips. These containers are normally positioned alongside the store's cash registers. The accumulated tips are distributed weekly to baristas and shift supervisors within a store in proportion to the number of hours worked that week by each individual.

The named plaintiffs are former Starbucks baristas. They filed a putative class action in a Massachusetts state court against Starbucks on behalf of themselves and others similarly situated. Starbucks removed the case to federal court, alleging class-action diversity jurisdiction. See 28 U.S.C. § 1332(d).

We fast-forward to the plaintiffs' filing of a second amended complaint. That complaint asserted, among other things,

that Starbucks' policy violated the Tips Act because it allowed shift supervisors to share in the pooled gratuities.

In due course, the plaintiffs moved to certify a class of current and former baristas, and the parties cross-moved for summary judgment. The district court referred the motions to a magistrate judge. Thereafter, the magistrate judge issued reports and recommendations.

In his first report, the magistrate judge recommended that the court grant partial summary judgment in the plaintiffs' favor on count 1 (the Tips Act count), reasoning that the inclusion of shift supervisors among the persons eligible to profit from the tips pools violated the Tips Act. Matamoros v. Starbucks Corp. (Starbucks I), No. 08-10772, 2011 U.S. Dist. LEXIS 28597 (D. Mass. Feb. 8, 2011). In that same report, the magistrate judge recommended that the court grant summary judgment for Starbucks on all other counts.[1] Id. at *28. In his second report, the magistrate judge recommended that the court grant class certification. Matamoros v. Starbucks Corp. (Starbucks II), No. 08-10772, 2011 U.S. Dist. LEXIS 28572 (D. Mass. Feb. 8, 2011). Over Starbucks' objections, the district court, adding its own gloss, adopted the magistrate judge's recommended findings and conclusions in all respects. Matamoros v. Starbucks Corp. (Starbucks III), No.

---

[1] These counts sound in quantum meruit, breach of implied contract, and tortious interference with advantageous relationships. The appeals before us do not implicate any of them.

-4-

08-10772, 2011 U.S. Dist. LEXIS 28227 (D. Mass. Mar. 18, 2011). It then allowed further discovery on issues related to damages.

In subsequent proceedings, the district court ruled that a jury trial was unnecessary because damages could readily be calculated based on the amount of tips allocated to shift supervisors during the class period (March 25, 2005 to March 18, 2011). The parties stipulated that the shift supervisors had garnered $7,500,000 in allocated tips during that period. This amount comprised $4,186,729 in tips received through July 11, 2008, and $3,313,271 in tips received during the remainder of the class period.

The court accepted these stipulated figures, awarded damages accordingly, and trebled the damages that accrued on or after July 12, 2008. The district court entered judgment for the plaintiff class in the aggregate amount of $14,126,542, plus prejudgment interest at a rate of 12% per annum.[2] These timely appeals followed.

## II. ANALYSIS

Starbucks' principal claim of error presents an unsettled question as to the meaning of the current version of the Tips Act. This question turns on whether, as Starbucks exhorts, the district

---

[2] The award of prejudgment interest was made applicable only to the damage award before any multiplication of damages took place. This aspect of the judgment is not challenged on appeal and we do not discuss it further.

-5-

court took too crabbed a view in holding that the company's tip-pooling policy violated the Tips Act because shift supervisors were included among the beneficiaries of the tips pools. We start there. We then address Starbucks' challenge to the class certification order. Finally, we mull the parties' competing objections to the treble damages award.

## A. **The Tips Act**.

The Tips Act contains specific provisions applicable to the restaurant industry. It provides in pertinent part that "wait staff" employees shall not be required to share tips with anyone who is not a "wait staff employee." Mass. Gen. Laws ch. 149, § 152A(b), (c). The Act defines a "wait staff employee" as:

> a person, including a waiter, waitress, bus person, and counter staff, who: (1) serves beverages or prepared food directly to patrons, or who clears patrons' tables; (2) works in a restaurant, banquet facility, or other place where prepared food or beverages are served; and (3) who has no managerial responsibility.

Id. § 152A(a) (emphasis supplied).

It is clear beyond peradventure that Starbucks' shift supervisors satisfy the first two requirements for "wait staff employees." The question, then, reduces to whether shift supervisors satisfy the third requirement; that is, whether shift supervisors can fairly be said to possess "no managerial responsibility."

Starbucks insists that shift supervisors do not have managerial responsibility within the meaning of the Tips Act. In

-6-

support, it points out that "[a] shift supervisor spends the vast majority of his or her time, up to ninety percent, performing functions which baristas also perform." Starbucks I, 2011 U.S. Dist. LEXIS 28597, at *9. Moreover, shift supervisors — like baristas — report to store managers and assistant managers, and Starbucks asserts that shift supervisors lack the actual authority either to enforce directives or to hire, fire, discipline, or promote baristas. And even though shift supervisors admittedly perform some duties that baristas do not, Starbucks labors to draw a surpassingly fine distinction between these "limited supervisory tasks" and "managerial responsibility."

In an effort to justify this hair-splitting, Starbucks notes that in defining a different term — "employer" — the Tips Act uses the disjunctive phrase "management or supervision of wait staff employees." Mass. Gen. Laws ch. 149, § 152A(a). It suggests, therefore, that the terms "management" and "supervision" must be given wholly distinct meanings. With this in mind, Starbucks declares that a shift supervisor can exercise supervisory powers without assuming managerial responsibilities.

The plaintiffs resist this analysis. They argue that the definition of "wait staff employee" forges a bright-line standard, which excludes employees possessing any level of managerial responsibility, however slight. Building on this foundation, the plaintiffs maintain that shift supervisors, whose job descriptions

-7-

include some managerial tasks, are simply not "wait staff employees" within the purview of the Tips Act.

Our inquiry into the meaning of the Tips Act engenders de novo review. See Inmates of Suffolk Cnty. Jail v. Rouse, 129 F.3d 649, 653 (1st Cir. 1997). Such an inquiry always starts with the language of the statute itself. Id. (citing Stowell v. Ives, 976 F.2d 65, 69 (1st Cir. 1992)). We assume that the ordinary meaning of the statutory language expresses the legislature's intent, and we resort to extrinsic aids to statutory construction (such as legislative history) only when the wording of the statute is freighted with ambiguity or leads to an unreasonable result. See Stowell, 976 F.2d at 69.

In this case, the unvarnished text of the statute cuts sharply in favor of a bright-line rule. The Tips Act states unequivocally that only employees who possess "no managerial responsibility" may qualify as "wait staff." Mass. Gen. Laws ch. 149, § 152A(a). "[N]o" means "no," and we interpret that easily understood word in its ordinary sense: "not any." Merriam-Webster's Collegiate Dictionary 839 (11th ed. 2003); The American Heritage Dictionary of the English Language 1192 (4th ed. 2000); The Random House Dictionary of the English Language 1303 (2d ed. 1987). "Courts are free to use standard dictionary definitions to assist in determining the ordinary meaning of statutory language," Riva v. Mass., 61 F.3d 1003, 1008 n.4 (1st Cir. 1995), and there is

no reason to refrain from doing so here.  Unless we are prepared to ignore both the legislature's use of the word "no" and the commonly accepted meaning of that word — and we are not — it follows that if an employee has any managerial responsibility, she does not qualify as "wait staff" eligible to participate in tips pools under the provisions of the Tips Act.

Nor is this construction of the statute unreasonable. While the legislature could have chosen a different way to grapple with the vexing problem of pooled tips, a bright-line rule has obvious virtues.

The legislative history and what little case law there is confirm the conclusion that the Tips Act should be read to bar employees who possess any managerial responsibilities from participating in tips pools with "wait staff" employees.  Under an earlier version of the Tips Act, Mass. Gen. Laws ch. 149, § 152A (2003) (amended 2004), Massachusetts courts generally applied a "primary duty" test to determine whether an employee was eligible to participate in a tips pool.  If an employee's primary duty was to serve customers, she was eligible to participate.  See, e.g., Williamson v. DT Mgmt., Inc., No. 021827D, 2004 WL 1050582, at *11 (Mass. Super. Ct. Mar. 10, 2004).  Conversely, if her primary duty was to manage, she was ineligible to participate.  See, e.g., Fernandez v. Four Seasons Hotels, Ltd., No. 024689F, 2007 WL

-9-

2705723, at *3 (Mass. Super. Ct. July 18, 2007) (interpreting pre-amendment version of Tips Act).

In 2004, the Massachusetts legislature amended the Tips Act. See 2004 Mass. Legis. Serv. ch. 125, § 13 (West). One apparent purpose of these amendments was to replace the primary duty test with a more precise standard. As one Massachusetts court explained, "[i]n the 2004 version of the Tips Act, the Legislature rendered the primary duty analysis moot by expressly limiting the statute's protection to employees with 'no managerial responsibility.'" Black v. Cranwell Mgmt. Corp., No. 2007-00122, slip op. at 13 (Mass. Super. Ct. Oct. 21, 2009). In its new incarnation, "[t]he Tips Act is unambiguous and does not distinguish between employees who have many managerial responsibilities and those who have few." Id. at 13-14; see also DePina v. Marriott Int'l, Inc., No. SUCV200305434G, 2009 WL 8554874, at *10-11 (Mass. Super. Ct. July 28, 2009) (applying current version of Tips Act to bar banquet captains from participating in tips pools with servers).

Viewed against this backdrop, Starbucks' emphasis on the predominant service responsibilities of the shift supervisors and its downplaying of their managerial responsibilities is a line of argument that time has overtaken. Stripped of rhetorical flourishes, Starbucks' position invites us to repudiate both the

precise language and the clear intent of the 2004 amendments and to resurrect the primary duty test. We decline the invitation.

If more were needed — and we doubt that it is — the interpretive guidance of the Massachusetts Attorney General presents a formidable obstacle to Starbucks' position. See Advisory 2004/3, An Advisory from the Attorney General's Fair Labor and Business Practices Division on an Act Protecting the Wages and Tips of Certain Employees (the Advisory). The Attorney General is charged with enforcing the Tips Act, see Mass. Gen. Laws ch. 149, § 152A(f), and her interpretation is entitled to "substantial deference." DiFiore v. Am. Airlines, Inc., 910 N.E.2d 889, 897 n.11 (Mass. 2009). Courts must honor such an interpretation as long as it is "reasonable." Id.

The Advisory could not be more clear; it states with conspicuous clarity that "[w]orkers with limited managerial responsibility, such as shift supervisors . . . do not qualify as wait staff employees." Advisory at 2. The Attorney General issued the Advisory with specific reference to the restaurant industry, and in that narrow context, "shift supervisors" appears to be a term of art. While job titles ordinarily are not dispositive in an inquiry into the application of a statute, they are not irrelevant. Where, as here, an employer "has the right to define jobs within its own hierarchy," its "designation of [a] position as supervisory, while not itself determinative, is certainly a

-11-

significant factor in ascertaining employee status." S. Ind. Gas & Elec. Co. v. NLRB, 657 F.2d 878, 886 (7th Cir. 1981).

The Advisory also elaborates on the meaning of "managerial responsibility" — a phrase not defined in the Tips Act itself. The Advisory states that managerial responsibilities encompass "supervising employees and assigning servers to their posts." Advisory at 2. The Attorney General explains that she "will look to 29 C.F.R. [§] 541.1 . . . and relevant law for interpretive guidance to define the term 'managerial responsibility.'" Id. at 2 n.3. Part 541 of Title 29 of the Code of Federal Regulations, which pertains directly to the federal overtime exemption for managerial and executive employees, identifies "directing the work of employees," "apportioning the work among the employees," and "providing for the safety and security of the employees or the property" as management activities. 29 C.F.R. § 541.102.

This interpretive guidance undermines Starbucks' argument. Its shift supervisors wear two hats; while they spend much of their time waiting on customers, they also have managerial responsibilities. For example, a shift supervisor is charged with opening and closing the store, handling and accounting for cash, and ensuring that baristas take their scheduled breaks. Indeed, whenever there is no store manager or assistant manager on duty in a particular emporium, the shift supervisor is the ranking employee

in the store. In this capacity, the shift supervisor is responsible for deploying baristas to their work stations, opening the store's safe, and handling cash register tills.

Starbucks' own sources lend strong support to the proposition that a shift supervisor possesses some managerial responsibility. When deposed, Starbucks' designated corporate representative, see Fed. R. Civ. P. 30(b)(6), acknowledged that a shift supervisor is responsible for "running the shift." Starbucks' internal documentation is even more revealing; its written job description for the position explains that each shift supervisor "directly manage[s]" three to six other employees while on shift. Shift supervisors' specific responsibilities include "direct[ing] partners to various workstations" and "providing . . . coaching and feedback." These are party admissions, see Fed. R. Evid. 801(d)(2), and party admissions are potent evidence of employee status.

Starbucks has a number of fallback arguments. The first of these suggests that a trial is necessary to determine whether shift supervisors actually possess managerial responsibility within the meaning of the Act. Starbucks is correct, of course, that the work actually performed by an employee is the most important factor to be considered when determining an employee's proper categorization in a statutory framework. Our earlier discussion of the relevance of job titles and descriptions does not suggest the

contrary. Here, however, Starbucks' argument lacks force. Although there may be some minor discrepancies in the record, the relevant evidence is largely undisputed. After careful perscrutation, we can discern no genuine issue as to any material fact that might require jury intervention.

At any rate, the evidence canvassed above describing the work actually performed by the shift supervisors makes it pellucid that shift supervisors possess managerial responsibility. Any other conclusion would blink reality.[3]

Starbucks has yet another shot in its sling. It asseverates that if shift supervisors are not wait staff, then the monies given by customers to recognize their service are not "tips" within the meaning of the Tips Act. See Mass. Gen. Laws ch. 149, § 152A(a) (defining a "[t]ip" as "a sum of money, including any amount designated by a credit card patron, a gift or a gratuity, given as an acknowledgment of any service performed by a wait staff employee, service employee, or service bartender"). This asseveration is too clever by half and, in the bargain, confuses two separate issues: what is a tip and who is eligible to share in tips pools. To begin, it is up to the customer — who is not in any way regulated by the Tips Act — to decide whether and how much to

---

[3] We have no need to trace the fine line that Starbucks seeks to draw between "management" and "supervision." The responsibilities assigned to the shift supervisors, while perhaps supervisory in some respects, include plainly managerial activities.

tip.  He acts on this intention by choosing a sum of money and placing it in the tips container.  So viewed, there is simply no question but that the money placed in a tips container by a grateful Starbucks patron is a tip, regardless of who waited on him.  Such sums are, in the idiom of the statute, gratuities "given as an acknowledgment of . . . service performed."  Mass. Gen. Laws ch. 149, § 152A(a).

Here, the issue is not whether the monies collected in the tips containers are tips; it defies reason to think of them as anything else.  Rather, the issue is which employees may receive distributions from the communal tips pools.  It is this issue that the Tips Act resolves.  In doing so, the Act prohibits a system in which wait staff and employees who have managerial responsibilities share in the same reservoir of tips.

Starbucks makes a plethora of other arguments, none of which requires extensive discussion.  We reject these arguments out of hand, pausing only to make three additional points.

First, Starbucks protests that it is inequitable to cut shift supervisors out of the tips pools when they spend the majority of their time serving customers alongside baristas.  This protest is disingenuous.  Starbucks is the architect of these tips pools, which flout the law and lump together eligible and ineligible employees.  If there is an inequity, the fault lies with Starbucks — not with the Tips Act.

Second, Starbucks criticizes both the wisdom and the fairness of the Tips Act as we have interpreted it. This criticism is misdirected. The Massachusetts legislature enacted the statute and it is not our place to second-guess either the wisdom or the fairness of policy judgments made in the public interest by a state legislature. See Vote Choice, Inc. v. DiStefano, 4 F.3d 26, 40 (1st Cir. 1993).

Third, Starbucks says that the district court's decision threatens to create a windfall for baristas. That is true as far as it goes — but it does not take Starbucks very far. The windfall comes about only because Starbucks put in place a policy that transgressed the Tips Act, so Starbucks is not in a position to complain. In any event, "in devising a type of 'strict liability' to achieve its goal — letting employees keep tips, gratuities, and fees called 'service charges' — the Legislature must be presumed to have factored into its calculus the risk of" some service employees "reap[ing] seemingly unfair benefits." See Cooney v. Compass Grp. Foodserv., 870 N.E.2d 668, 673-74 (Mass. App. Ct. 2007).

In this case, all roads lead to Rome. The plain language of the Act, the legislative purpose underlying it, and the Attorney General's interpretive guidance coalesce to counsel in favor of the conclusion that Starbucks' Massachusetts-based shift supervisors are not "wait staff" within the meaning of the Tips Act. The evidence, even when viewed in the light most favorable to

Starbucks, admits of no other plausible conclusion. Since shift supervisors are not "wait staff," the district court did not err in holding them ineligible to share in tips pools with baristas.

## B. **Class Certification**.

In its certification order, the district court established a class of "[a]ll individuals who were employed as baristas at any Starbucks store located in the Commonwealth of Massachusetts at any time between March 25, 2005, and [March 18, 2011], inclusive." Starbucks II, 2011 U.S. Dist. LEXIS 28572, at *2. Starbucks laments that the district court erred in certifying this class. We review the grant or denial of class certification for abuse of discretion. Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 295 (1st Cir. 2000). An abuse occurs when a court, in making a discretionary decision, relies upon an improper factor, neglects a factor entitled to substantial weight, or considers the correct mix of factors but makes a clear error of judgment in weighing them. Id.

We begin with first principles. The Civil Rules establish four elements that must be present in order to obtain class certification. This taxonomy comprises numerosity of claims, commonality of legal or factual questions, typicality of representative claims or defenses, and adequacy of representation. Fed. R. Civ. P. 23(a); see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613-14 (1997). Starbucks trains its sights primarily on

the fourth element, contending that an insurmountable intra-class conflict destroys any hope of adequacy of representation. In elaboration, Starbucks explains that the designated class representatives (the named plaintiffs) are baristas who, in its view, cannot protect the interests of over 450 former baristas who became shift supervisors at some point during the class period (and, thus, would be financially disadvantaged by a decision striking down Starbucks' current policy).[4]

The district court rejected this contention, reasoning that "an interest by certain putative class members in maintaining the allegedly unlawful policy is not a reason to deny class certification." Starbucks III, 2011 U.S. Dist. LEXIS 28227, at *3. We agree.

We do not gainsay that the class, as certified, is not monolithic; it embodies a potential for conflict. But perfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable. "Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement." 1 William B. Rubenstein, Newberg on Class Actions § 3:58 (5th ed. 2012). Put

---

[4] To place Starbucks' estimate of the number of baristas-turned-shift supervisors into perspective, we note that the plaintiff class as a whole is estimated to number approximately 11,200 individuals.

another way, to forestall class certification the intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole. See, e.g., In re NASDAQ Mkt.-Makers Antitrust Litig., 169 F.R.D. 493, 514-15 (S.D.N.Y. 1996).

We think that the district court acted within the realm of its discretion in determining that there was no intractable conflict here. A barista-turned-shift supervisor will only be considered a member of the class (and entitled to damages) for the period during which she was a barista. She will share in the awarded class-wide damages for that period. And inasmuch as shift supervisors are not named as defendants, a barista-turned-shift supervisor will not be required to reimburse any funds that she may have received from the tips pools after she was promoted. Last but not least, if a barista-turned-shift supervisor is uncomfortable with the attack launched by the plaintiff class on Starbucks' tips policy, she — like every other class member — has the right to opt out of the class. The availability of this option is an important factor in weighing the effect of a largely hypothetical conflict on a class-certification decision. See Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 43 (1st Cir. 2003).

Taking a different tack, Starbucks argues that the certified class is unascertainable and overbroad because certain experienced baristas provide coaching and direction to less

-19-

experienced co-workers. This assistance, Starbucks argues, renders those baristas ineligible to receive tips under the district court's construction of "wait staff." This argument trenches on the frivolous.

The class is ascertainable under the objective standard of job titles and includes those who worked as baristas during the class period. The presence of such an objective criterion overcomes the claim that the class is unascertainable. See 5 James Wm. Moore et al., Moore's Federal Practice § 23.21[3][a] (3d ed. 2012) ("For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria.").

At the risk of belaboring the obvious, we add that even if some baristas occasionally render the same sort of assistance to co-workers as shift supervisors are required to do, they are not responsible for rendering that assistance. A barista's job description does not contain any managerial responsibilities. Thus, baristas remain "wait staff" eligible to participate in tips pools, notwithstanding their volunteered activities. Starbucks' claim of overbreadth is, therefore, bogus.

In a last-ditch effort to defeat class certification, Starbucks posits that a class action will not resolve the rights of all interested parties in the absence of shift supervisors. This prognostication constitutes little more than whistling past the

graveyard. It is true, of course, that the maintenance of this class action, in its present form, leaves open the possibility of additional litigation at the behest of shift supervisors. Cf. Winans v. Starbucks Corp., 796 F. Supp. 2d 515, 517 (S.D.N.Y. 2011) (describing putative class action brought by former assistant store managers, claiming that Starbucks' tip distribution policy improperly precludes them from participating in the tips pools). But the mere fact that a class action will not resolve every conceivable issue touching upon a challenged policy or practice does not require a court to throw out the baby with the bath water. So it is here: considerations of fairness and judicial economy are well-served by resolving the baristas' claims in a class action. In particular, the questions of law and fact common to class members and presented by the plaintiffs' complaint greatly predominate over any questions affecting individual members. We conclude, therefore, that a class action is superior to other alternative ways of adjudicating this controversy. See Fed. R. Civ. P. 23(b).

## C. **Treble Damages**.

Guided by the parties' stipulation, the district court determined that the amount of damages owed to the class — that is, the total amount of funds unlawfully paid to shift supervisors from the tips pools during the class period — was $7,500,000. The court then trebled the damages that had accrued after July 11, 2008

($3,313,271). Starbucks challenges the trebling of this portion of the damages. The plaintiffs cross-appeal, contending that all of the damages should have been trebled.

The district court's award of treble damages rests on a provision of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 150. This provision was amended effective July 12, 2008, see 2008 Mass. Legis. Serv. ch. 80, § 5 (West), and the district court concluded that the amended verison of the law required the automatic trebling of damages from that point forward. Starbucks does not contest this interpretation but, rather, insists that the amended provision transgresses due process by requiring the automatic imposition of punitive damages without a finding of reprehensibility. We review this claim of constitutional error de novo. See, e.g., United States v. Morales-De Jesús, 372 F.3d 6, 8 (1st Cir. 2004).

Starbucks premises its argument on the Supreme Court's decision in State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408 (2003). There, the Court held that "punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." Id. at 419. Starbucks' premise is faulty: the decision in Campbell — which addressed jury-awarded punitive damages in civil tort actions — is inapposite.

Here — unlike in Campbell — there is no cause for concern about the "imprecise manner in which punitive damages systems are administered" by juries. Id. at 417. To the contrary, the current treble damages provision in the Massachusetts Wage Act reflects a reasoned legislative judgment. This is an important distinction. See, e.g., Cook Cnty., Ill. v. U.S. ex rel. Chandler, 538 U.S. 119, 132 (2003) (noting that "[t]reble damages certainly do not equate with classic punitive damages, which leave the jury with open-ended discretion over the amount").

At any rate, the Massachusetts legislature has made clear that the current provision allowing treble damages under the Wage Act is a liquidated damages provision. See Mass. Gen. Laws ch. 149, § 150 (stating that "[a]n employee so aggrieved who prevails in such an action shall be awarded treble damages, as liquidated damages, for any lost wages and other benefits" (emphasis supplied)). The Supreme Court has held in an analogous context that liquidated damages "constitute[] compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages." Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707 (1945) (construing Fair Labor Standards Act). By definition, therefore, liquidated damages are not punitive damages. See Marshall v. Brunner, 668 F.2d 748, 753 (3d Cir. 1982).

That ends this aspect of the matter. Because an award of treble damages pursuant to the current version of the Massachusetts Wage Act is neither an award of punitive damages nor fairly analogous to such an award, Starbucks' due process concerns are misplaced.

The plaintiffs' cross-appeal is no more persuasive. They argue that the district court abused its discretion in failing to award treble damages for that portion of the class period prior to July 12, 2008. During that interval, an earlier version of the Wage Act was in place. Under this version, the decision about whether to award treble damages lay entirely within the discretion of the trial court. See Wiedmann v. The Bradford Grp., Inc., 831 N.E.2d 304, 313 (Mass. 2005).

The Massachusetts Supreme Judicial Court explained that such an award was "appropriate where conduct is 'outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.'" Rosnov v. Molloy, 952 N.E.2d 901, 905 (Mass. 2011) (quoting Wiedmann, 831 N.E.2d at 313). Applying this standard, the district court ruled ore sponte that, with respect to the period prior to July 12, 2008, "the defendant's conduct was not outrageous enough to warrant treble damages."

This ruling passes muster. The district court cited the correct legal standard, and its refusal to impose treble damages for the earlier part of the class period was not unreasonable.

-24-

After all, the Tips Act was amended in 2004 and had not been authoritatively construed during the relevant time frame. Although Starbucks fashioned a policy that, after litigation, was found to run afoul of the Tips Act, there is no compelling evidence that it either violated the statute willfully or acted with reckless indifference to the rights of others. By the same token, the record contains no evidence suggesting that Starbucks harbored an evil motive.

In an effort to overcome these considerations, the plaintiffs point out that the district judge, in disallowing their claim, said that Starbucks' "conduct was not outrageous enough to warrant treble damages." They say, a fortiori, that the conduct must have been outrageous to some degree, thus paving the way for an award of treble damages. This is sheer persiflage.

We do not read the Massachusetts cases as requiring treble damages under the earlier version of the Wage Act whenever some hint of outrageousness exists. Outrageousness is often a matter of degree. Most people would think that bilking a widow out of her life's savings is outrageous; some would think that charging $5.25 for a salted caramel mocha frappuccino is outrageous. But everyone would agree that the two acts are qualitatively different, and are not deserving of the same level of opprobrium. It is for the district court, exercising its informed discretion, to determine when particular conduct sinks to a level that warrants

the multiplication of damages.  See, e.g., N.J. Coal. of Rooming & Boarding House Owners v. Mayor & Council of City of Asbury Park, 152 F.3d 217, 224-25 (3d Cir. 1998).

## III.  CONCLUSION

The parties, represented by skilled counsel, have tried valiantly to show us how and why the district court committed some reversible error.  In the end, however, their efforts fail.

We need go no further.  For the reasons elucidated above, we affirm the judgment of the district court in all respects.

**Affirmed**.